American Civil Liberties Union, a New York Corporation, and Charles Liebman, Plaintiffs-Appellants, v. City of Chicago, a Municipal Corporation, Martin H. Kennelly and Timothy J. O'Connor, Defendants-Appellees.

Gen. No. 46,889.

First District, First Division.

March 18, 1957.

Released for publication April 9, 1957.

Richard Orlikoff, Sanford I. Wolff, and Abner J. Mikva, all of Chicago, for appellants; Henry Heineman, and F. Raymond Marks, Jr., of Chicago, of counsel.

John C. Melaniphy, Corporation Counsel, for defendants-appellees.

JUDGE FRIEND delivered the opinion of the court.

Sections 155—1-155—7 of the Municipal Code of Chicago make it unlawful to exhibit any motion picture or to distribute any motion picture to any exhibitor in the city without having first secured a permit from the commissioner of police. The commissioner is required to issue the permit upon application and payment of the prescribed fee unless he determines that the picture is "immoral or obscene . . . ," in which case he is required to refuse a permit. The American Civil Liberties Union and Charles Liebman, assignees of the right to distribute and exhibit in Chicago a motion picture called *The Miracle,* applied to the commissioner for a permit. The commissioner refused to issue it on the ground that the picture was immoral and obscene. As provided by the ordinance, an appeal was taken to the mayor, who affirmed the commissioner's decision.

Thereupon plaintiffs filed a complaint in the Circuit Court seeking a declaration that they had the right to exhibit the motion picture without first obtaining a license from the defendants, the city of Chicago, its mayor and its police commissioner. Upon hearing, Judge Fisher found the provisions of the code to be unconstitutional and restrained defendants from interfering with plaintiffs' right to exhibit the film: he

certified that, in his opinion, public interest required that an appeal be taken directly to the Supreme Court of Illinois. Accordingly, defendants appealed to the Supreme Court, which (American Civil Liberties Union v. City of Chicago, 3 Ill.2d 334) reversed the trial court, holding that the ordinance was constitutional and that the city had the right to deny a license if it found that the film was "obscene." The cause was remanded to the Circuit Court with instructions to determine whether or not the motion picture was obscene. At this point in the proceedings plaintiffs appealed to the United States Supreme Court which, in a six-three decision (American Civil Liberties Union v. City of Chicago, 348 U. S. 979), refused to take jurisdiction of the cause "for want of a final judgment," Justices Black, Douglas and Harlan dissenting.

Upon redocketing of the cause in the Circuit Court, it was assigned to Judge Tuohy, who found the film to be "obscene" and concluded that plaintiffs had no right to exhibit it in Chicago. Judgment was entered for defendants, and this appeal followed.

Because plaintiffs were not issued a permit, the picture has never been publicly shown in Chicago. *The Miracle* was produced in Italy by Roberto Rossellini, with Anna Magnani in the leading role. The United States Supreme Court had occasion to view this film, as reported in the case of Burstyn v. Wilson, 343 U. S. 495. There, Mr. Justice Frankfurter, specially concurring in the judgment of the court, introduced Bosley Crowther's summary of the story from the Atlantic Monthly, April 1951: " 'A poor, simple-minded girl is tending a herd of goats on a mountainside one day, when a bearded stranger passes. Suddenly it strikes her fancy that he is St. Joseph, her favorite saint, and that he has come to take her to heaven, where she will be happy and free. While she pleads with him to transport her, the

280

stranger gently plies the girl with wine, and when she is in a state of tumult, he apparently ravishes her. (This incident in the story is only briefly and discreetly implied.)

" 'The girl awakens later, finds the stranger gone, and climbs down from the mountain not knowing whether he was real or a dream. She meets an old priest who tells her that it is quite possible that she did see a saint, but a younger priest scoffs at the notion. "Materialist!" the old priest says.

" 'There follows now a brief sequence—intended to be symbolic, obviously—in which the girl is reverently sitting with other villagers in church. Moved by a whim of appetite, she snitches an apple from the basket of a woman next to her. When she leaves the church, a cackling beggar tries to make her share the apple with him, but she chases him away as by habit and munches the fruit contentedly.

" 'Then, one day, while tending the village youngsters as their mothers work at the vines, the girl faints and the women discover that she is going to have a child. Frightened and bewildered, she suddenly murmurs, "It is the grace of God!" and she runs to the church in great excitement, looks for the statue of St. Joseph, and then prostrates herself on the floor.

" 'Thereafter she meekly refuses to do any menial work and the housewives humor her gently but the young people are not so kind. In a scene of brutal torment, they first flatter and laughingly mock her, then they cruelly shove and hit her and clamp a basin as a halo on her head. Even abused by the beggars, the poor girl gathers together her pitiful rags and sadly departs from the village to live alone in a cave.

" 'When she feels her time coming upon her, she starts back towards the village. But then she sees the crowds in the street; dark memories haunt her; so she turns towards a church on a high hill and in-

281

stinctively struggles towards it, crying desperately to God. A goat is her sole companion. She drinks water dripping from a rock. And when she comes to the church and finds the door locked, the goat attracts her to a small side door. Inside the church, the poor girl braces herself for her labor pains. There is a dissolve, and when we next see her sad face, in a closeup, it is full of a tender light. There is the cry of an unseen baby. The girl reaches towards it and murmurs, "My son! My love! My flesh!" ' "

It appears from Burstyn v. Wilson that the picture had been banned in New York on the ground that it was " 'sacrilegious.' " The United States Supreme Court held "that under the First and Fourteenth Amendments a state may not ban a film on the basis of a censor's conclusion that it is 'sacrilegious,' " and concluded by saying that "since the term 'sacrilegious' is the sole standard under attack here, it is not necessary for us to decide, for example, whether a state may censor motion pictures under a clearly drawn statute designed and applied to prevent the showing of obscene films. That is a very different question from the one now before us." In his specially concurring opinion, Mr. Justice Reed went beyond the majority opinion by stating that "this film does not seem to me to be of a character that the First Amendment permits a state to exclude from public view."

In his concurring opinion, in which Justices Jackson and Burton joined, Mr. Justice Frankfurter says: " 'The Miracle'—a film lasting forty minutes—was produced in Italy by Roberto Rossellini. Anna Magnani played the lead as the demented goat-tender. It was first shown at the Venice Film Festival in August, 1948, combined with another moving picture, 'L'Umano Voce,' into a diptych called 'Amore.' According to an affidavit from the Director of that Festival, if the motion picture had been 'blasphemous' it

would have been barred by the Festival Committee. In a review of the film in L'Osservatore Romano, the organ of the Vatican, its film critic, Piero Regnoli, wrote: 'Opinions may vary and questions may arise—even serious ones—of a religious nature (not to be diminished by the fact that the woman portrayed is mad [because] the author who attributed madness to her is not mad) . . . .' While acknowledging that there were 'passages of undoubted cinematic distinction,' Regnoli criticized the film as being 'on such a pretentiously cerebral plane that it reminds one of the early d'Annunzio.' The Vatican newspaper's critic concluded: 'we continue to believe in Rossellini's art and we look forward to his next achievement.' In October, 1948, a month after the Rome premiere of 'The Miracle,' the Vatican's censorship agency, the Catholic Cinematographic Centre, declared that the picture 'constitutes in effect an abominable profanation from religious and moral viewpoints.' By the Lateran agreements and the Italian Constitution the Italian Government is bound to bar whatever may offend the Catholic religion. However, the Catholic Cinematographic Centre did not invoke any governmental sanction thereby afforded. The Italian Government's censorship agency gave 'The Miracle' the regular *nulla osta* clearance. The film was freely shown throughout Italy, but was not a great success. Italian movie critics divided in opinion. The critic for II Popolo, speaking for the Christian Democratic Party, the Catholic party, profusely praised the picture as a 'beautiful thing, humanly felt, alive, true and without religious profanation as someone has said, because in our opinion the meaning of the characters is clear and there is no possibility of misunderstanding.' Regnoli again reviewed 'The Miracle' for L'Osservatore Romano. After criticising the film for technical faults, he found 'the most courageous and interesting

283

passage of Rossellini's work' in contrasting portrayals in the film; he added: 'Unfortunately, concerning morals, it is necessary to note some slight defects.' He objected to its 'carnality' and to the representation of illegitimate motherhood. But he did not suggest that the picture was 'sacrilegious.' The tone of Regnoli's critique was one of respect for Rossellini, 'the illustrious Italian producer.' "

In American Civil Liberties Union v. City of Chicago, the Supreme Court of Illinois, on review of Judge Fisher's judgment, noted that it had twice previously upheld the constitutionality of the ordinance in question, that "defendants consider the question settled," but that plaintiffs took the position that the court's decisions were superseded by subsequent decisions of the United States Supreme Court which plaintiffs regarded as rendering unconstitutional, "as a prior restraint upon freedom of speech," all censorship of motion pictures. In view of this contention the Illinois Supreme Court considered that disposition of the case required a review of its former decisions, as well as a consideration of the decisions of the United States Supreme Court, and after a detailed discussion of both State and Federal cases concluded that "in any event, we do not regard these decisions [Federal cases] as automatically compelling us to overrule this court's prior approval of the Chicago censorship ordinance," but "we do regard them . . . as requiring a re-examination of that ordinance in terms of the standards and the procedures which are available to the State in the highly sensitive area of prior restraint upon the expression of ideas." Considering first the standards of the ordinance, the court observed that censorship in this case rests upon the ground that the film is obscene; and after expressing the view that the meaning of the term "obscene" does not vary with the particular medium of expression, proceeded to

284

review and discuss the judicial interpretations placed on the term "obscene" and the relative importance of instances of obscene diction or episodes in relation to the entire text, as treated in the numerous state and federal decisions, textbooks and law journals cited in the opinion as applicable mainly to the censorship of books. In the light of the authorities reviewed, the court pertinently observed that "the general course of decisions indicates that the work in question is approached as an aggregate of different effects, and the determination turns on whether the salacious aspects are so objectionable as to outweigh whatever affirmative values the book may possess . . ." The court found the attitude of Judge Learned Hand, in United States v. Kennerley, 209 Fed. 119, persuasive: "I question whether in the end men will regard that as obscene which is honestly relevant to the adequate expression of innocent ideas, and whether they will not believe that truth and beauty are too precious to society at large to be mutilated in the interests of those most likely to pervert them to base uses. Indeed, it seems hardly likely that we are even to-day so lukewarm in our interests in letters or serious discussion as to be content to reduce our treatment of sex to the standard of a child's library in the supposed interests of a salacious few . . ." In the light of the decisions cited and discussed, Mr. Justice Schaefer, speaking for the court, prescribed the standard for determining obscenity as follows: "We hold, therefore, that a motion picture is obscene within the meaning of the ordinance if, when considered as a whole, its calculated purpose or dominant effect is substantially to arouse sexual desires, and if the probability of this effect is so great as to outweigh whatever artistic or other merits the film may possess. In making this determination the film must be tested with reference to its effect upon the normal, average person." Con-

285

tinuing, the court enunciated the rule that "upon review of the censor's action, the plaintiff does not carry a burden of proving that that action was arbitrary and unreasonable, but rather . . . it must affirmatively be made to appear that the film fairly falls within the proscriptive terms of the ordinance."

■■ Under this rule the censoring authority, in refusing to issue a permit for showing the film, should be obliged to specify reasons for so doing; and upon trial of the issue whether the ban is justified, the trial court should require the censor to assume the burden of establishing the validity of his refusal. The trial court, as well as the reviewing court, would then have a record, in addition to the film itself, on which to decide whether the ban should be approved. To permit the banning of a motion picture film without requiring the censoring authority to substantiate his action runs directly counter to the spirit and the letter of the law relating to censorship. Freedom of expression is the rule, limitations upon it the exception; in accord with this doctrine, and in conformity with the Illinois Supreme Court ruling that the censoring authority must assume the burden of his action, such authority must present compelling and persuasive reasons to establish a film as obscene; such a determination must rest on something more than mere speculation. Without such procedure, the courts become, not only the final tribunal to pass upon films, but the only tribunal to assume the responsibilities of the censoring authority.

The evidence introduced by the city in support of the ruling here appealed from consisted of the film itself and two still enlargements made from the opening portion of the film—one of Webster's International Dictionary (Unabridged), open to the page containing the definition of the word "love"; the other, a part of the definition reading: ". . . ardent affection, passionate attachment, men's adoration of God,

286

sexual passion, gratification, devotion." Defendants offered no evidence in support of their reasons for rejecting the picture on the ground of obscenity but stood on the film alone. After viewing *The Miracle,* Judge Tuohy held it to be "obscene" within the meaning of the term as defined by the Illinois Supreme Court. The calculated purpose of the film, he felt, narrowed down to a presentation of sexual passion and gratification. In considering the effect of the film, the trial judge discussed the morals of the goatherdess portrayed in the picture, the events leading to her motherhood—including the advances by the stranger on the mountainside—and concluded that, taken with the dictionary definition, the predominant effect of the film was to arouse sexual passion.

As the case comes to us for review, the question presented is whether the trial court properly applied to the picture the test of the term "obscenity." Since the film is attached to the record as an exhibit, and in the absence of any supporting evidence offered by defendants for rejecting the film, we were obliged to rely on the film alone for the purpose of determining whether it falls within the scope of the term "obscene" as legally defined.

*The Miracle* is the story of a demented girl who thought she saw in a bearded stranger St. Joseph and envisioned a hope that he would take her to Heaven. Following the incident on the mountainside—which was but one of a series of events and, it seemed to us, one handled with appropriate restraint—she regards herself as a virgin destined to bear a child; the remainder of the film is concerned primarily with her belief in her destiny, with her abject misery, and with her long climb up a steep hill to a deserted church where she gives birth to her child. To suggest that the predominant effect of the film is to arouse sexual passion is to deny the producer's intent and his artist-

287

ry, and to emphasize the incident on the mountainside as against the principal theme of the picture; it is to overlook the aesthetic and the dramatic merit of the film. Rossellini, the producer, stated (as quoted in Mr. Justice Frankfurter's concurring opinion in the Burstyn case) that " 'In *The Miracle* men are still without pity because they still have not come back to God, but God is already present in the faith, however confused, of that poor, persecuted woman; and since God is wherever a human being suffers and is misunderstood, *The Miracle* occurs when at the birth of the child the poor, demented woman regains sanity in her maternal love.' " Thus, we think, the emphasis is wrongly placed if sexual passion is considered as the mainspring of the action; it is, rather (to go back to the dictionary definition as given at the outset of the film), "men's adoration of God." The love of a girl for a man—or, more accurately here, her transient interest in a man—, and the love of a mother for her child, are used in *The Miracle,* by way of cumulative effect, by way of contrast, to highlight and interpret the principal theme of men's adoration of God. To adopt the comment of William P. Clancy from *The Commonweal* (likewise a quotation from Mr. Justice Frankfurter's concurring opinion) : " 'the film is not *obviously* blasphemous or obscene, either in its intention or execution.' "

The Hicklin standard, as formulated by Cockburn, C. J., in 1868 in Regina v. Hicklin, L. R. 3 Q. B. 360, was based on "whether the tendency of the matter charged as obscenity is to deprave and corrupt those whose minds are open to such immoral influences and into whose hands a publication of this sort might fall"—thus making the young, the inexperienced or the salaciously inclined individual the object of the censor's protection; the lower Federal courts here followed this test until 1913, when Judge Hand, in the

288

Kennerley opinion, in effect rejected the Hicklin individual as the norm when he stated that he "scarcely" thought that "they [society] would forbid all which might corrupt the most corruptible, or that society is prepared to accept for its own limitations those which may perhaps be necessary to the weakest of its members." "To put thought," he continued, "in leash to the average conscience of the time is perhaps tolerable, but to fetter it by the necessities of the lowest and least capable seems a fatal policy." "The views thus expressed by Judge Hand were subsequently taken up," Judge Schaefer commented in the American Civil Liberties Union opinion, "and the Hicklin test was repudiated in the Federal courts, in proceedings under both the postal and tariff laws. The rule now followed there, and generally in the State courts is that a book is to be judged as a whole and in terms of its effect on the average, normal reader."

It is not at all probable, it seems to us, that *The Miracle* would arouse sexual desires in the "average, normal" individual contemplated by Judge Schaefer; indeed, it appears unlikely that even the salaciously inclined individual would be so affected by a film whose central character is clothed only in rags and whose personality is devoid of any charm; there is no gloss of glamour anywhere in the film.

▆▆▆ Censorship is not unconstitutional, but it is a power which must be exercised with the greatest care. The Illinois Supreme Court follows and enjoins this rule of caution; therefore, a motion picture should not be excluded from public view unless it is fairly shown to lie within the proscribed area defined by the ordinance. *The Miracle,* as we view it, is not such a picture. Accordingly, we think the trial court erred in holding it to be obscene. For the reasons indicated, the judgment of the Circuit Court is reversed and the cause remanded with directions to enter judgment for

plaintiffs, to order defendants to issue a permit upon application and payment therefor, and to enjoin them from interfering with the exhibition in Chicago of the motion picture film, *The Miracle.*

Judgment reversed and cause remanded with directions.

BURKE, J., concurs.

NIEMEYER, P. J., took no part.