**CAPITOL ENTERPRISES, INC., a Maryland Corporation, Plaintiff-Appellant,**

v.

**CITY OF CHICAGO, a municipal corporation, Richard J. Daley and Timothy J. O'Connor, Defendants-Appellees.**

No. 12392.

United States Court of Appeals
Seventh Circuit.

Nov. 6, 1958.

Abner J. Mikva, Milton I. Shadur, Chicago, Ill., for appellant.

John C. Melaniphy, Corp. Counsel, Robert J. Collins, Sydney R. Drebin, Asst. Corp. Counsel, Chicago, Ill., for appellees.

Before FINNEGAN, SCHNACKENBERG and PARKINSON, Circuit Judges.

FINNEGAN, Circuit Judge.

Unless a motion picture be first approved by, and a permit secured from, the Commissioner of Police it is unlawful to exhibit it in any public place within the City of Chicago, Illinois. Sections 155–1 to 155–7, Municipal Code of Chicago, contain the details of such prior restraint and among those provisions the following are relevant here:

"155–4. Such permit shall be granted only after the motion picture film for which said permit is requested has been produced at the office of the commissioner of police for examination or censorship.

"If a picture or series of pictures, for the showing or exhibition of which an application for a permit is made, is immoral or obscene, or portrays depravity, criminality, or lack

of virtue of a class of citizens of any race, color, creed, or religion and exposes them to contempt, derision, or obloquy, or tends to produce a breach of the peace or riots, or purports to represent any hanging, lynching or burning of a human being, it shall be the duty of the commissioner of police to refuse such permit; otherwise it shall be his duty to grant such permit.

"In case the commissioner of police shall refuse to grant a permit as hereinbefore provided, the applicant for the same may appeal to the mayor. Such appeal shall be presented in the same manner as the original application to the commissioner of police. The action of the mayor on any application for a permit shall be final.

"155-5. In all cases where a permit for the exhibition of a picture or series of pictures has been refused under the provisions of the preceding section because the same tends towards creating a harmful impression on the minds of children, where such tendency as to the minds of adults would not exist if exhibited only to persons of mature age, the commissioner of police may grant a special permit limiting the exhibition of such picture or series of pictures, to persons over the age of twenty-one years; provided such picture or pictures are not of such character as to tend to create contempt or hatred for any class of law abiding citizens."

Plaintiff, Capitol Enterprises, Inc., a Maryland Corporation, distributor for the motion picture entitled "Mom and Dad" requested a permit, under the Chicago Ordinance, and received this reply from the commanding officer of the Censor Unit, Chicago Police Department: "The motion picture, 'Mom and Dad,' was submitted for censorship by previous owners and agents. It was rejected on four occasions on the ground that it was immoral and obscene, and as such was deemed to be in violation of Section 155-

4 of the Municipal Code of Chicago. Your checks * * * are herewith enclosed and returned."

Capitol then appealed, under § 155-4, to the Mayor of Chicago, informing him *inter alia* that since 1948, "substantial changes [had been] made in the content of the film. A number of the original scenes were eliminated and a number of new scenes * * * inserted * * *." Plaintiff requested a hearing and an opportunity to present evidence. The Mayor responded by letter dated February 18, 1958, stating: "The motion picture has again been reviewed and the decision of the Commissioner of Police is confirmed. Consequently, no permit will be issued for the exhibition of * * * [the] film in the City of Chicago."

"The action of the mayor," under Ordinance § 155-4, "on any application for a permit shall be final." Accordingly, and relying upon diversity of citizenship, plaintiff, on March 25, 1958, commenced suit in the U. S. District Court seeking an order restraining various public officials from preventing it from exhibiting the film; and to have the Ordinance declared unconstitutional. To this complaint bottomed on the First and Fourteenth Amendments to the Constitution, defendants, the City, Mayor and Police Commissioner, filed an answer consisting primarily of general denials. Plaintiff then tendered the movie for viewing by the district judge, moved for summary judgment, and its complaint was dismissed; judgment entered for defendants. Among his findings the trial judge itemized these:

"14. The court further finds that the question of the constitutionality of the ordinance of the City of Chicago involved herein raised in Count 3 of plaintiff's complaint is frivolous.

"15. The court further finds, having viewed the motion picture in evidence as defendants' Exhibit B, that said motion picture is obscene and immoral *if exhibited for entertainment* and that plaintiff applied

for a license or permit under said ordinance. (Italics ours.)

"16. That the defendants lawfully and properly denied plaintiff a permit or license to exhibit said motion picture."

█ ▪ Our review on the appeal taken by plaintiff from the judgment entered below must be made within the constitutional framework at the federal level. To be sure this Ordinance survived Illinois judicial scrutiny in American Civil Liberties Union v. City of Chicago, 1955, 3 Ill.2d 334, 121 N.E.2d 585, but we are not foreclosed from subjecting either the Ordinance or its application to constitutional tests, and, indeed the Supreme Court reversed Times Film Corporation v. City of Chicago, 1957, 355 U.S. 35, 78 S.Ct. 115, 2 L.Ed.2d 72, decided under that same ordinance.

We viewed the condemned film which is, of course, the prime exhibit in the record on appeal, and for convenience consider this motion picture divisible into three major parts. The first, and prolix portion animates the theme of the need for sex instruction through a superficial plot, and innocuous acting, depicting a family unit, dominated by a prim mother who denies her nubile teenage daughter any sex knowledge or guidance, a frisky wholesome male sibling, and a weary pliant father. At a high school dance, one evening the young lady encounters a slightly more sophisticated male applicant for the freshman class at a nearby college. A pastoral scene complete with falling leaves and orchestral crescendo symbolizes the transfer of this young uninformed girl from agonized doubt into exaggerated certainty. She is later seen traveling with her mother to Boston for the confinement, and the main plot finally ends on the note of a happy family reunion bound up with tacit understanding engendered by a youngish male high school teacher playing the role of presiding receptive intelligence whose lucidity at first frustrated, finally triumphs at the end of part one.

Wholly disconnected from what has preceded it, part two, introduced as a film within a film, is straightforward instruction on sex. Diagrams are used for explanations of post-insemination stages from embryo to fetus. Following these diagrams there are two separate surgical inserts, one showing a normal delivery, and the other a Caesarian section. Both sequences, focusing on surgical techniques, were apparently photographed at a hospital, and while each shows the birth of a human baby neither departs from its sterile medical environment. Throughout this stage of the film the sound track is devoted solely to inoffensive explanation and instruction.

Venereal disease is the subject of part three and consists primarily of photographs of the human ear, eye, nose and throat, showing the ravages of syphilis. Thousands of young men who served in our armed forces have, without doubt, viewed much stronger versions of this same theme shown in required training films at basic training centers.

Little has been authoritatively written explaining "prior" or "previous" restraint,[1] instead those words are frequently found as part of an incantation used when some censorship determination is judicially annulled. Whether those words work the annulment or if annulment requires such words is difficult of discovery. But, there is a wide chasm between censoring motion pictures before deciding if they can be publicly exhibited and exhibiting a picture to the public for which criminal punishment might be imposed. In the latter situation[2] all the familiar procedural safeguards come into play while in the other instance there are no procedural safeguards and communication is choked off

1. See Kingsley Books, Inc. v. Brown, 1957, 354 U.S. 436, 77 S.Ct. 1325, 1 L.Ed.2d 1469, for the use by a State of an order restraining distribution of obscene booklets, held not to be a "prior restraint."

2. A potential impact on exhibitors lies in combining the Ordinance with criminal provisions in Ill.Rev.Stat., 1957, chap. 38, pars. 470–472, §§ 224½–224b.

at the threshold. Submission to compulsory censorship as a condition precedent to public exhibition is undoubtedly more facile unencumbered, as it is, by any procedural safeguards. Complete censorship, as we now have before us, is much like the case of obtaining indictments before a grand jury—no defense counsel is present. There, however, the analogy ends for persons accused of crime are eventually accorded some rights, but in censorship [3] social context may be measured by six or seven persons against, as here, a society of more than approximately 3,620,962 persons, and the applicant for a permit apparently need never be heard, nor is the right to trial by petit jury available.

American Civil Liberties Union v. City of Chicago, 1954, 3 Ill.2d 334, 121 N.E. 2d 585 is used by the defendants as their main authority for resisting reversal of the judgment below. It is true, as respondents' brief shows, the United States Supreme Court did dismiss that appeal, but for the reason, as we ascertained, "for want of a final judgment." 1955, 348 U.S. 979, 75 S.Ct. 572, 99 L.Ed. 763. All this goes further, because that case, American Civil Liberties Union v. City of Chicago, was reversed and remanded (3 Ill.2d 334, 353, 121 N.E.2d 585) for trial and when it reached the Illinois trial judge he held the motion picture involved, "The Miracle," obscene; another appeal followed resulting in the opinion reported as American Civil Liberties Union v. City of Chicago, 1957, 13 Ill.App.2d 278, 289–290, 141 N.E.2d 56, 62 where the Illinois Appellate Court, First District, First Division, directed "the cause remanded with directions to enter judg-

ment for plaintiffs," and ordered "defendants to issue a permit upon application and payment therefor, and to enjoin them from interfering with the exhibition in Chicago of the motion picture film, The Miracle." Leave to appeal that Appellate Court decision was denied by the Illinois Supreme Court on September 24, 1957. Parenthetically, at least, it might be mentioned that "The Miracle" film is the same one which survived after the review in Burstyn, Inc., v. Wilson, 1952, 343 U.S. 495, 497, 72 S.Ct. 777, 96 L.Ed. 1098, and, indeed, this fact precipitated the following passage concerning it, in American Civil Liberties Union: "We [the Illinois Supreme Court] may say at once that we do not regard that decision [Burstyn] as having completely immunized 'the Miracle' against censorship. The sole basis of censorship in that case [Burstyn] was that the film was sacrilegious; power to censor upon any other basis was not considered by the Supreme Court * * *. And the court [Supreme Court of the United States] expressly reserved decision on the question 'whether a state may censor motion pictures under a clearly drawn statute designed and applied to prevent the showing of obscene films.'" 3 Ill.2d 334, 339, 121 N.E.2d 585, 588.[4]

Two separate appeals, one (Roth) from a Federal conviction and the other (Alberts) from a California verdict of guilty, were combined for disposition and opinions by a divided court, the majority of which affirmed both convictions and reported as Roth v. United States, 1957, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498. Roth, a New York book dealer, solicited sales through his advertising

**3.** In Commercial Pictures Corp. v. Board of Regents. 1954, 346 U.S. 587, 74 S.Ct. 286, 98 L.Ed. 329, the Supreme Court invalidated censoring based on the test, "immoral."

**4.** See however R.K.O. Radio Pictures v. Department of Education, 1954, 162 Ohio St. 263, 122 N.E.2d 769, 771 for a discussion of Mr. Justice Clark's statement: "it is not necessary for us to decide, for example, whether a state may

censor motion pictures *under a clearly drawn* statute designed and applied to prevent the showing of obscene films." The Ohio Supreme Court was talking about the United States Supreme Court's disposition of its opinion in Superior Films, Inc., v. Dept. of Education, 1953, 159 Ohio St. 315, 112 N.E.2d 311, reversed (per curiam) 1954, 346 U.S. 587, 74 S.Ct. 286, 98 L.Ed. 329. See also Hallmark Productions v. Carroll, 1956, 384 Pa. 348, 121 A.2d 584.

circulars sent by mail. He was charged with wilfully, unlawfully and lewdly disseminating obscene matter in violation of the federal obscenity statute—18 U.S. C. § 1461. Alberts, on the other hand, operated a mail-order business out of Los Angeles where he was convicted in the Municipal Court, Beverly Hills Judicial District, for lewdly keeping for sale obscene and indecent books, and with writing and publishing an obscene advertisement of them, in violation of the California Penal Code. West's Calif. Penal Code Ann., 1955, § 311. "The dispositive question" presented for the majority by Mr. Justice Brennan, was, "whether obscenity is utterance within the area of protected speech and press." 354 U.S. 476, 481, 77 S.Ct. 1304, 1307, 1 L.Ed.2d 1498. Elsewhere in his opinion the Justice stated: "The constitutionality of a criminal obscenity statute is the question in each of these cases. In Roth, the primary constitutional question is whether the federal obscenity statute violates the provision of the First Amendment that 'Congress shall make no law * * * abridging the freedom of speech, or of the press * * *' In Alberts, the primary constitutional question is whether the obscenity provisions of the California Penal Code invade the freedoms of speech and press as they may be incorporated in the liberty protected from state action by the Due Process Clause of the Fourteenth Amendment." While it was held "that obscenity is not within the area of constitutionally protected speech or press" this certainly cannot be rationally interpreted so that any communication might be rubber-stamped "obscene" through the apparatus of preventive censorship. The communication must first be obscene before deprived of its constitutional shelter. Roth bristles with explanations and interpretations of "obscene" and "pruriency," but none of them encompasses the film involved here. During the course of his opinion Mr. Justice Brennan concluded at one point: "It is therefore vital that the standards for judging ob-scenity safeguard the protection of freedom of speech and press for material which does not treat sex in a manner appealing to prurient interest." 1957, 354 U.S. 476, 488, 77 S.Ct. 1304, 1311, 1 L.Ed. 2d 1498.

Value changes that have occurred and are persistently occurring, in this country gradually brought motion pictures to the status of a constitutionally protected medium and consequently early censorship cases serve very little in this modern setting. See e. g. Burstyn, Inc. v. Wilson, 1952, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098. Judges, no less than legislators should observe, without prejudice, what is going on in our changing society, averting through such alertness treating law as a petrified body of shibboleths. In the past "obscene" was hedged about with all the unreasoning of verbal taboos and the community imagined that word was "invariant under transformation." Coming to terms with change, running throughout the Supreme Court decisions in the previous restraint field during the past years, reveals the penumbra of uncertainty radiating from the use of the word "obscene." And, comparatively recently Mr. Justice Schaefer, speaking for the Illinois Supreme Court, in American Civil Liberties Union v. City of Chicago, 1954, 3 Ill.2d 334, 347, 121 N.E.2d 585, 592, interpreted the Ordinance now before us, in this fashion: " * * * [A] motion picture is obscene within the meaning of the ordinance if, *when considered as a whole,* its *calculated* purpose or *dominant effect* is substantially to arouse sexual desires, and if the probabilities of this effect is so great as to outweigh whatever artistic or other merits the film may possess. In making this determination the film must be tested with reference to its effect upon the *normal, average person.*" (Italics supplied.) A good deal of fruitless controversy might arise if our appraisal of this film be construed as meaning we substituted our judgments for those announced by the censors. But the current exigency is nothing new. See e. g. Unit-

ed States v. Dennett, 2 Cir., 1930, 39 F.2d 564, 76 A.L.R. 1092.[5] We think the censors' classification of "Mom and Dad" was unwarranted. Struggling to reach by reasoning absolute certainty of what shall be classed as obscene unduly strains the legal machinery. Only by a close study of the facts [6] as they confront judges when a record is made in these cases, can it be determined whether a censor has frustrated an owner, publisher, or exhibitor by an inaccurate classification. After all, censors come to their work with preconceived notions and only an objective comparison of their judgments with the facts allows for legalistic evaluation. Just why they categorized this motion picture as "immoral and obscene" is undisclosed by the City censors and we will not assume what, if anything, in that film caused them to forbid exhibition.

Nothing in the passage we quoted from the Censor Unit's letter to plaintiff indicates whether the meaning ascribed to "obscene" by the Illinois Supreme Court played any part in appraising the film, and obviously if the "four occasions" mentioned in that letter were in 1948, the answer is American Civil Liberties was decided September 20, 1954. On the other hand the Mayor's communication is equally uninformative since it employs the ambiguous phrase "again reviewed" without particularizing whether the reference is to the film or another viewing by the police unit or another review of the four prior decisions. The record before us is barren of any findings of fact by the censors and all it shows is that somebody sometime classed some edition of the film "immoral and obscene." From

the district judge's findings it appears "That the said Timothy J. O'Connor [Commissioner of Police] appointed a Censor Board consisting of six persons to aid and assist him in his duties under * * * said ordinance." While § 155–2 authorizes the Commissioner to "cause" films to be inspected, no standards relevant here are provided for the guidance of either the Commissioner or his board other than "immoral and obscene"—incidentally an alternative and construed in 1954 by the Illinois Supreme Court as being synonymous terms. We think the censors' determination in the case before us "is wholly without reasonable basis," borrowing that phrase from American Civil Liberties Union v. City of Chicago, 1954, 3 Ill.2d 334, 349, 121 N.E.2d 585. Indeed we are curious as to whether the City censors viewed the identical film that we did. However, in the last cited case the opinion writer also said: " * * [U]pon review of the censors' action, the plaintiff does not carry a burden of proving that the action was arbitrary and unreasonable, but rather that it must affirmatively be made to appear that the film fairly falls within the proscriptive terms of the ordinance." 3 Ill.2d 334, 351, 121 N.E.2d 585, 594. It is our considered judgment and opinion that the subject film is well outside the ambit of the Ordinance.

Capitol Enterprises, Inc., v. Regents of University, 1956, 1 A.D.2d 990, 149 N.Y.S.2d 920, 921–922 is the memorandum decision by the Supreme Court, Appellate Division, of New York reviewing refusal to license, "Mom and Dad," apparently the same film now before us. Annulling the determination of the Board

---

5. "We have been referred to no decision where a truthful exposition of the sex side of life, evidently calculated for instruction and for the explanation of relevant facts, has been held to be obscene." Judge Augustus N. Hand speaking for the court in United States v. Dennett, 2 Cir., 1930, 39 F.2d 564, 569, 76 A.L.R. 1092.

6. For example, "The charge in the information is predicated upon a picture story consisting of stills, taken from a

moving picture entitled 'The Birth of a Baby.' In addition to the stills, there are two sets of anatomical diagrams * * *. [T]he picture story * * * does not fall within the forbidden class. The picture story was directly based on a film produced under the auspices of a responsible medical group. There is no nudity or unnecessary disclosure. The subject has been treated with delicacy." People v. Larsen, Sp.Sess.1938, 5 N.Y.S. 2d 55, 56.

of Regents, and directing issuance of the license, five New York Judges stated, after viewing the film: "One sequence, to which the licensing division objected, portrays under restrained and controlled conditions, a human birth. A sequence is a biological demonstration, scientific in level and tone * * * we hold that this film is not 'indecent', in the sense required to justify prior restraint. If the words 'obscene' or 'indecent' can serve at all as constitutionally valid standards for prior restraint, the words must be given a narrow and restricted interpretation and, so interpreted, the words are clearly not applicable to the film before us * * *. In deciding this case, we exercise our own judgment as to the film and the validity of the refusal to license it." Unlike the Chicago Police Commissioner the Regents stated their grounds for refusing the permit.

We have resolved plaintiff's appeal without passing upon the constitutional validity of the Ordinance because it is unnecessary to reach that problem. Even if it be assumed *arguendo* that the Ordinance survived the constitutional challenge we are of the opinion it was unconstitutionally applied in this instance.[7] Our decision rests on narrow but firm grounds for we are satisfied there was absent any sound basis for outlawing the film and the absence of any reasons by the censors for their classification is a foreboding guise for arbitrary censorship running afoul of the First and Fourteenth Amendments. Nothing has been put forward by the City indicating just what in this film are its inherent evils. A social problem requires defining and that has not been attempted here. Consequently this censorship results in a curb on free expression and it is our view that the trial judge erred; adding the phrase "if exhibited for entertainment"[8] in finding 15 diluted his ultimate conclusion for it manifests doubt, if not reluctance, to permit suppression of the film. Instead of controlling the audience under § 155-5 the Commissioner selected complete restraint, and our decision can only treat with that result.

The judgment appealed is reversed and the cause remanded to the district court with directions to grant the relief prayed for in paragraphs (a) and (c)[9] of plaintiff's complaint.

Judgment reversed and the cause remanded to the district court with directions.

SCHNACKENBERG, Circuit Judge.

I concur in the result reached by Judge FINNEGAN in his opinion and also with all that is said therein which is necessary to said result.

---

7. "We agree that the determination that a film or book is obscene must rest on something more than speculation, and that the tendency toward sexual stimulation must be probable and substantial." American Civil Liberties Union v. City of Chicago, 1954, 3 Ill.2d 334, 347, 121 N.E.2d 585, 592.

8. "What is one man's amusement, teaches another's doctrine," taken out of context from Winters v. People of State of New York, 1948, 333 U.S. 507, 510, 68 S.Ct. 665, 667, 92 L.Ed. 840.

9. "(a) That the Court issue an order restraining defendants City of Chicago, Richard J. Daley, as Mayor of said City of Chicago, and Timothy J. O'Connor, as Police Commissioner of said City of Chicago, individually and as acting officers of the City of Chicago, and all police officers, agents, servants and employees acting for and on behalf of the City of Chicago from preventing, hindering or otherwise interfering with the plaintiff, its officers or agents in the exhibition of the film 'Mom and Dad' in the City of Chicago, Illinois."

"(c) That the Court issue an order directed to defendants City of Chicago, Richard J. Daley, Mayor of said City of Chicago, and Timothy J. O'Connor, Police Commissioner of said City of Chicago, commanding defendants to issue forthwith to plaintiff the permit required by the aforesaid municipal ordinance without further submission of the motion picture 'Mom and Dad' for censorship of content."