**ZENITH INTERNATIONAL FILM CORPORATION, Plaintiff-Appellant,**

v.

**CITY OF CHICAGO, ILL., Richard J. Daley and Kyran Phelan, Defendants-Appellees.**

**No. 13008.**

United States Court of Appeals Seventh Circuit.

June 20, 1961.

Hubert L. Will, Joseph Schneider, Chicago, Ill., for appellant.

Robert J. Collins, Asst. Corp. Counsel, John C. Melaniphy, Corporation Counsel, Sydney R. Drebin, Asst. Corporation Counsel, Chicago, Ill., for appellees.

Before HASTINGS, Chief Judge, and DUFFY and KNOCH, Circuit Judges.

HASTINGS, Chief Judge.

The Supreme Court, in Times Film Corp. v. City of Chicago, 1961, 365 U.S. 43, 81 S.Ct. 391, 5 L.Ed.2d 403, held that the prior restraint imposed by a certain Chicago city ordinance which required submission before exhibition of all films to municipal authorities for their examination was not *per se* a violation of the constitutional guarantee of freedom of speech. The Court rejected what it characterized as a "broadside" attack, i. e., that under *no* circumstances can a municipality censor movies and must content itself with criminal or civil sanctions subsequent to the first exhibition. The Court expressly noted that it decided only the *question* of the freedom "to exhibit, at least once, any and every

kind of motion picture." Id., 365 U.S. at page 46, 81 S.Ct. at page 393.

Thus has been determined the basic, broad question of prior restraint in the exhibition of motion pictures. A city may choose this form of regulation. The Court stated, "It is not for this Court to limit the State in its selection of the remedy it deems most effective to cope with such a problem, absent, of course, a showing of unreasonable strictures on individual liberty resulting from its application in particular circumstances." Id., 365 U.S. at page 50, 81 S.Ct. at page 395.

Although the question of the constitutionality of prior restraint has now been answered, many complex issues still remain unsettled. One is the problem of the legitimate standards or criteria upon which a municipality may reject a film for public distribution. In each case, a valid standard must be applied to the film in issue. And finally, in the municipal administration of the exercise of such prior restraint, it remains to be determined whether procedural due process has been accorded to those sought to be restrained.

It is with this latter question that we are concerned in the instant appeal.

Plaintiff-appellant Zenith International Film Corporation made application on September 6, 1959 to the Commissioner of Police of Chicago, Timothy J. O'Connor, for a permit to exhibit the film, "The Lovers." Such application was made pursuant to Chapter 155, Sections 155–1 to 155–4 of the Municipal Code of the City of Chicago, set out infra.

The film was then referred to a board of review which viewed it. To this body Commissioner O'Connor had delegated the duty of reviewing motion pictures for which permits had been requested.

On September 21, 1959, Commissioner O'Connor notified Zenith that he would not issue the requisite permit to exhibit the film in Chicago on the ground that "The Lovers" was immoral and obscene.

Pursuant to the foregoing municipal ordinance, Zenith thereupon appealed this decision to the Mayor of the City of

Chicago, Richard J. Daley. On December 2, 1959, Zenith received a letter from John C. Melaniphy, Corporation Counsel for the City of Chicago, stating that the appeal had been referred to the City's law department. The letter further stated:

"The motion picture has been re-reviewed and it is recommended that a permit be issued with the understanding that one of the obscene scenes in the picture be deleted. If you will contact Sergeant Vincent Nolan of the Police Censor Board, he will advise you as to the particular scene. If it is desired that the distributor will not delete this scene, then the permit shall not issue."

On December 14, 1959, the president of Zenith came to Chicago from New York and with counsel met with Sergeant Nolan, Director of the Police Censor Unit, and Officer Considine of the Police Censor Unit. The purpose of such meeting was to discuss the "particular scene" referred to in Melaniphy's letter of December 2, 1959. Sergeant Nolan then advised Zenith that notwithstanding the letter of December 2, 1959, his instructions from Commissioner O'Connor were to insist upon the same cuts that had been originally proposed in September, namely, substantially all of the fifth reel of the film comprising literally hundreds of scenes. Commissioner O'Connor subsequently confirmed these instructions; and on February 3, 1960 Mayor Daley formally denied the appeal of Zenith from the order of Commissioner O'Connor and refused to issue plaintiff a permit to exhibit the film "The Lovers" in the City of Chicago.

Zenith then brought this action in the federal district court against defendants City of Chicago, Richard J. Daley, Mayor of the City of Chicago, and Kyran Phelan, duly appointed and acting Commissioner of Police. The complaint prayed for an order directing defendants to issue to Zenith a permit to exhibit the film "The Lovers" and for a further order enjoining defendants from preventing Zenith's exhibition of the film in the City of Chicago. It was alleged that the action of defendants infringed upon and denied Zenith its constitutional rights of freedom of speech, freedom of the press and freedom to engage in lawful business activities. Further, the municipal ordinance in question was alleged to violate the First and Fourteenth Amendments to the Constitution inasmuch as it established no standards whereby the Commissioner of Police or the Mayor could determine whether a film is immoral or obscene, leaving such determination to be a matter of mere subjective preference.

In addition, in its complaint Zenith charged, and defendants admitted in their answer, that "[f]rom the date the film was submitted for review and up to the date plaintiff's appeal to defendant Daley was denied, neither defendant Daley, former Commissioner O'Connor, defendant Phelan, Corporation Counsel Melaniphy, Assistant Corporation Counsel Hartigan nor Sergeant Nolan had viewed the film in its entirety."

The district court viewed the film and considered briefs of the parties. Thereafter, in a written opinion it held that "The Lovers," judged by tests set out by the United States Supreme Court and the Illinois Supreme Court, "appeals to the prurient interest, is obscene, and therefore censorable under the Chicago ordinance." Further, it held, consistent with the subsequent Supreme Court decision in Times Film, supra, that prior restraint of movies was not *per se* unconstitutional. Finally, the district court examined the procedural protections afforded Zenith in the city's application of its power of prior restraint and found them consistent with such restraint approved in Kingsley Books, Inc. v. Brown, 1957, 354 U.S. 436, 77 S.Ct. 1325, 1 L.Ed. 2d 1469. This appeal followed.

We have heard arguments, received briefs, and viewed the film in question. We make no determination as to the obscenity of such film but pass directly to the basic question of the *municipal administration of the prior restraint* as the record reveals it here.

"The essence of justice is largely procedural." [1] In an area which involves important property rights, basic constitutional freedoms, and comprehensive municipal licensing, fair and adequate administrative procedure should be guaranteed. It is at the municipal level, in the first instance, that the permissible criteria of censorship must be applied. The alternative would compel the federal courts, in all instances where local determinations are challenged, to assume the role of censor, exercising their judgment *de novo* as to the obscenity of a particular film.

The record before us reveals that the municipal procedure here followed constitutes the antithesis of a fair determination of the obscenity of the film in question.

The city ordinance under which Zenith applied for, and was denied, its permit provides as follows:

"Permit required

"155–1. It shall be unlawful for any person to show or exhibit in a public place, * * * [any motion picture] without first having secured a permit therefor from the commissioner of police.

\* \* \* \* \* \*

"The permit herein required shall be obtained for each and every picture or series of pictures exhibited and is in addition to any license or other imposition required by law or other provision of this code.

"Any person exhibiting any picture or series of pictures without a permit having been obtained therefor shall be fined not less than fifty dollars nor more than one hundred dollars for each offense. A separate and distinct offense shall be regarded as having been committed for each day's exhibition of each picture or series of pictures without a permit."

"Application

"155–2. Before any such permit is granted, an application in writing shall be made therefor, and the * * films, * * * shall be shown to the commissioner of police, who shall inspect such * * * films, * * * or cause them to be inspected, and within three days after such inspection he shall either grant or deny the permit. In case a permit is granted, it shall be in writing and in such form as the commissioner of police may prescribe."

"Granting of permit

"155–4. Such permit shall be granted only after the motion picture film for which said permit is requested has been produced at the office of the commissioner of police for examination or censorship.

"If a picture or series of pictures, for the showing or exhibition of which an application for a permit is made, is immoral or obscene, [or falls within other prescribed standards], it shall be the duty of the commissioner of police to refuse such permit; otherwise it shall be his duty to grant such permit.

"In case the commissioner of police shall refuse to grant a permit as hereinbefore provided, the applicant for the same may appeal to the mayor. Such appeal shall be presented in the same manner as the original application to the commissioner of police. The action of the mayor on any application for a permit shall be final."

Proceeding under such provisions, Zenith made application for a permit to exhibit its motion picture. The sole group that saw the entire film was the Film Review Board, a body to whom the Commissioner of Police had delegated his power of censorship over the film. The remainder of the responsible municipal officials saw only the fifth reel of the film, to which objection was taken. The City has admitted that defendant Daley, Commissioner O'Connor, defendant Phelan, city attorneys in the Corporation Counsel's office, and the police sergeant who

1. 1 Davis, Administrative Law Treatise 506 (1st ed. 1958).

is director of the Police Censor Board did not view the film in its entirety. Even appellate counsel who argued the case before us stated that he had viewed only the fifth reel of the film.

█ Thus, the only group who possibly could have applied the proper criterion of obscenity to the film was the Film Review Board. The Supreme Court has emphasized that it is *as a whole* that a work must be judged, not merely by plucking isolated scenes or passages from such work. Roth v. United States, 1957, 354 U.S. 476, 489, 490, 77 S.Ct. 1304, 1 L.Ed.2d 1498.

The Film Review Board is not a creature of the ordinance as far as the record here reveals. There are no standards for appointment, no formal procedures for determination, no opportunity for public hearing, argument, or the introduction of evidence.

The record reveals that there was no opportunity for an adequate hearing at any level of the municipal proceedings. There was no *de novo* hearing before the Mayor, for he admittedly did not view the film as a whole.

After separate application by appeal was made to the Mayor following the Commissioner's denial of a permit, the corporation counsel wrote that if one scene was deleted, a permit would issue. An abortive meeting was held at which the president and counsel for Zenith were present. The Commissioner and his sergeant in charge of the Police Censor Board stood firm on their earlier September position that the entire fifth reel must be cut. Representatives of the Mayor's office indicated they could not force the Commissioner to change his position. The Mayor refused to overrule his Commissioner and later formally denied the issuance of a permit. This was the sole "hearing" afforded Zenith—a meeting, concerned mainly with the squabble among city officials, none of whom had seen the film as a whole, as to what scenes must be expunged to make "The Lovers" non-obscene.

█ Further, there was no opportunity before the censorship board or before the Mayor or his delegate for Zenith to show that its film did not offend contemporary community standards. Again, the Supreme Court has set the criterion for obscenity not at an individual, subjective level but at the benchmark of a general, objective determination whether a work appeals to the prurient interests of the community at large. Roth v. United States, 1957, 354 U.S. 476, 489, 490, 77 S.Ct. 1304. There was never an opportunity for those responsible city officials to make their judgment aided by movie reviews or other evidence Zenith might marshal in support of its application.

At no time during the administrative proceedings was there a particularized statement of why Zenith was refused a permit. Commissioner O'Connor said that the film was immoral and obscene; Corporation Counsel Melaniphy, after "rereviewing" the film, wrote of "one of the obscene scenes in the picture." However, Zenith was given no further indication of how its film fell short of any standards set by the city. In fact, at no time was the single scene to which the Mayor's office objected ever specifically identified.

The result is that the record before us is completely devoid of any rationalization by the City why it should in this particular case interfere with the free expression of ideas.[2] As the Illinois Ap-

2. Cf., "Just why they categorized this motion picture as 'immoral and obscene' is undisclosed by the City censors * *." "The record before us is barren of any findings of fact by the censors and all it shows is that somebody sometime classed some edition of the film 'immoral and obscene.' "

"Our decision rests on narrow but firm grounds for we are satisfied there was absent any sound basis for outlawing the film and the absence of any reasons by the censors for their classification is a foreboding guise for arbitrary censorship running afoul of the First and Fourteenth Amendments. Nothing has been put forward by the City indicating just what in this film are its inherent evils. A social problem requires defining and that has not been attempted here. Con-

pellate Court has cogently stated:

"Under this rule the censoring authority, in refusing to issue a permit for showing the film, *should be obliged to specify reasons for so doing;* and upon trial of the issue whether the ban is justified, the trial court should require the censor to assume the burden of establishing the validity of his refusal. The trial court, as well as the reviewing court, would then have a record, in addition to the film itself, on which to decide whether the ban should be approved. To permit the banning of a motion picture film without requiring the censoring authority to substantiate his action runs directly counter to the spirit and the letter of the law relating to censorship. Freedom of expression is the rule, limitations upon it the exception; in accord with this doctrine, and in conformity with the Illinois Supreme Court ruling that the censoring authority must assume the burden of his action, such authority must present compelling and persuasive reasons to establish a film as obscene; such a determination must rest on something more than mere speculation. Without such procedure, the courts become, not only the final tribunal to pass upon films, but the only tribunal to assume the responsibilities of the censoring authority." (Emphasis added.) American Civil Liberties Union v. City of Ch'cago, 1957, 13 Ill.App.2d 278, 286, 141 N.E.2d 56, 60.

■ To summarize, Zenith has been deprived of its right to a full and fair hearing in the comprehensive Chicago licensing procedure. There was no opportunity for any sort of fair hearing before municipal authorities at any level of the proceedings; Zenith had no opportunity to present evidence of contemporary community standards; the responsible city officials failed to view the

film as a whole and thus could under no circumstances apply the proper standard of obscenity; there was no *de novo* hearing before the Mayor; the sole group that saw the film was a Film Review Board whose procedure does not allow for a hearing; there are no standards for selection of such Board and no safeguards to preclude an entirely arbitrary judgment on its part; and finally, there was no indication given to Zenith why the city found the film to be "obscene and immoral."

The fundamental procedural elements of notice and hearing have been denied Zenith where they should have been provided—before the licensing body itself. Chicago's *administration* of its power of prior restraint over the distribution of films falls far short of the procedural guarantees afforded in the prior restraint approved in Kingsley Books, Inc. v. Brown, 1957, 354 U.S. 436, 77 S.Ct. 1325, 1 L.Ed.2d 1469.

■ The recent Times Film decision does not provide *carte blanche* authorization for *ad hoc*, unfair, abortive municipal licensing procedures. We reemphasize that it does hold that a city has the *power* to impose a system of prior restraints on movie distribution, if it does so properly. Chicago's procedure, as followed in the case at bar, is lacking in the requisite elements of procedural due process. Its administration of the ordinance in question has not guaranteed that there are no "unreasonable strictures on individual liberty resulting from its application in [these] particular circumstances." Times Film Corp. v. City of Chicago, supra, 365 U.S. at page 50, 81 S.Ct. at page 395.

The judgment of the district court is vacated, and the cause is remanded to the district court with the following instructions: The relief requested by plaintiff shall be granted unless the city provides a hearing consistent with the standards set out herein within a reasonable time after Zenith's resubmission of the film

sequently this censorship results in a curb on free expression * * *." Cap-

itol Enterprises, Inc. v. City of Chicago, 7 Cir., 1958, 260 F.2d 670, 675, 676.

to proper city authorities. If the film is found obscene or otherwise objectionable after a proper procedural determination by the city authorities, plaintiff may then challenge before the district court such finding of obscenity. The district court may grant such relief and entertain such proceedings as necessary to implement these instructions, without prejudice to the right of either party to seek further review thereof by this court.

Judgment vacated.

Remanded with instructions.