INTERSTATE CIRCUIT, INC. *v.* CITY OF DALLAS.

No. 56.   Argued January 15–16, 1968.—Decided April 22, 1968.*

---

*Together with No. 64, *United Artists Corp.* v. *City of Dallas,* on appeal from the same court.

*Grover Hartt, Jr.,* argued the cause for appellant in No. 56. With him on the briefs was *Edwin Tobolowsky.* *Louis Nizer* argued the cause for appellant in No. 64. With him on the briefs were *Paul Carrington* and *Dan McElroy.*

*N. Alex Bickley* argued the cause for appellee in both cases. With him on the briefs was *Ted P. MacMaster.*

Briefs of *amici curiae,* urging reversal in No. 64, were filed by *Irwin Karp* for the Authors League of America, Inc., and by *Osmond K. Fraenkel, Edward J. Ennis, Melvin L. Wulf* and *Alan H. Levine* for the American Civil Liberties Union et al.

Mr. Justice Marshall delivered the opinion of the Court.

Appellants are an exhibitor and the distributor of a motion picture named "Viva Maria," which, pursuant to a city ordinance, the Motion Picture Classification Board of the appellee City of Dallas classified as "not suitable for young persons." A county court upheld the Board's determination and enjoined exhibition of the film without acceptance by appellants of the requirements imposed by the restricted classification. The Texas Court of Civil Appeals affirmed,[1] and we noted probable jurisdiction, 387 U. S. 903, to consider the First and Fourteenth Amendment issues raised by appellants with respect to appellee's classification ordinance.

That ordinance, adopted in 1965, may be summarized as follows.[2] It establishes a Motion Picture Classification Board, composed of nine appointed members, all of whom serve without pay. The Board classifies films as "suitable for young persons" or as "not suitable for young persons," young persons being defined as children who have not reached their 16th birthday. An exhibitor must be specially licensed to show "not suitable" films.

The ordinance requires the exhibitor, before any initial showing of a film, to file with the Board a proposed classification of the film together with a summary of its

---

[1] 402 S. W. 2d 770 (1966). The Texas Supreme Court denied discretionary review and therefore the appeal is from the judgment of the Court of Civil Appeals. 28 U. S. C. § 1257 (2).

[2] The ordinance is set forth in an Appendix to this opinion. The parties disagree as to the meaning of certain of its provisions that have not been authoritatively interpreted by courts of the State. The differences are not material to our decision, however, and the summary of the ordinance in the text above should not be taken as acceptance by us of any of the parties' conflicting interpretations, nor as expressing any view on the validity of provisions of the ordinance not challenged here.

plot and similar information. The proposed classification is approved if the Board affirmatively agrees with it, or takes no action upon it within five days of its filing.

If a majority of the Board is dissatisfied with the proposed classification, the exhibitor is required to project the film before at least five members of the Board at the earliest practicable time. At the showing, the exhibitor may also present testimony or other support for his proposed classification. Within two days the Board must issue its classification order. Should the exhibitor disagree, he must file within two days [3] a notice of nonacceptance. The Board is then required to go to court within three days to seek a temporary injunction, and a hearing is required to be set on that application within five days thereafter; if the exhibitor agrees to waive notice and requests a hearing on the merits of a permanent injunction, the Board is required to waive its application for a temporary injunction and join in the exhibitor's request. If an injunction does not issue within 10 days of the exhibitor's notice of nonacceptance, the Board's classification order is suspended.[4] The ordinance does not define the scope of judicial review of the Board's determination, but the Court of Civil Appeals held that *de novo* review in the trial court was required.[5] If an injunction issues and the exhibitor seeks appellate review, or if an injunction is refused and the Board appeals, the

---

[3] The two-day period is apparently part of an attempt to assure prompt final determination. The ordinance also provides that "any initial or subsequent exhibitor" may seek reclassification of a film previously classified.

[4] Appellants assert that, despite the seemingly clear words of the suspension provision, exhibitors in practice have not been free to show films without a not suitable notification while a court challenge is pending, even though an injunction has not issued within the 10-day period. See n. 2, *supra*.

[5] 402 S. W. 2d 770, 774–775.

Board must waive all statutory notices and times, and join a request of the exhibitor, to advance the case on the appellate court's docket, *i. e.*, do everything it can to assure a speedy determination.

The ordinance is enforced primarily by a misdemeanor penalty: an exhibitor is subject to a fine of up to $200 if he exhibits a film that is classified "not suitable for young persons" without advertisements clearly stating its classification or without the classification being clearly posted, exhibits on the same program a suitable and a not suitable film, knowingly admits a youth under age 16 to view the film without his guardian or spouse accompanying him,[6] makes any false or willfully misleading statement in submitting a film for classification, or exhibits a not suitable film without having a valid license therefor.

The same penalty is applicable to a youth who obtains admission to a not suitable film by falsely giving his age as 16 years or over, and to any person who sells or gives to a youth under 16 a ticket to a not suitable film, or makes any false statements to enable such a youth to gain admission.[7]

Other means of enforcement, as against the exhibitor, are provided. Repeated violations of the ordinance, or persistent failure "to use reasonable diligence to determine whether those seeking admittance to the exhibition of a film classified 'not suitable for young persons' are below the age of sixteen," may be the basis for revoca-

---

[6] Appellee says that youths under 16 years of age accompanied throughout the showing of the picture by a guardian (parent) or spouse, may attend not suitable films. Appellants read the ordinance as making the existence of such accompaniment solely a matter of defense should a criminal prosecution ensue. See n. 2, *supra.*

[7] See n. 6, *supra.* It appears that a parent who purchases a ticket to a not suitable film and gives it to his child is subject to the

tion of a license to show not suitable films.[8]  Such a persistent failure, or exhibition of a not suitable film by an exhibitor with three convictions under the ordinance, *inter alia,* are defined as "public nuisances," which the Board may seek to restrain by a suit for injunctive relief.

The substantive standards governing classification are as follows:

" 'Not suitable for young persons' means:

"(1) Describing or portraying brutality, criminal violence or depravity in such a manner as to be, in the judgment of the Board, likely to incite or encourage crime or delinquency on the part of young persons; or

"(2) Describing or portraying nudity beyond the customary limits of candor in the community, or sexual promiscuity or extra-marital or abnormal sexual relations in such a manner as to be, in the judgment of the Board, likely to incite or encourage delinquency or sexual promiscuity on the part of young persons or to appeal to their prurient interest.

"A film shall be considered 'likely to incite or encourage' crime delinquency or sexual promiscuity on the part of young persons, if, in the judgment of the Board, there is a substantial probability that it will create the impression on young persons that such conduct is profitable, desirable, acceptable, respectable, praiseworthy or commonly accepted.

---

misdemeanor penalty of the ordinance. To be sure, appellee indicated at oral argument that criminal sanctions have not been sought against anyone under the ordinance.

[8] In related litigation, the provision for revocation of the special license was held unconstitutional as violative of *Butler* v. *Michigan,* 352 U. S. 380 (1957), by District Judge Hughes, 249 F. Supp. 19, 25 (D. C. N. D. Tex., 1965), and that ruling was not challenged on appeal. See *Interstate Circuit, Inc.* v. *City of Dallas,* 366 F. 2d 590, 593, n. 5 (C. A. 5th Cir. 1966).

A film shall be considered as appealing to 'prurient interest' of young persons, if in the judgment of the Board, its calculated or dominant effect on young persons is substantially to arouse sexual desire. In determining whether a film is 'not suitable for young persons,' the Board shall consider the film as a whole, rather than isolated portions, and shall determine whether its harmful effects outweigh artistic or educational values such film may have for young persons."

Appellants attack those standards as unconstitutionally vague. We agree. Motion pictures are, of course, protected by the First Amendment, *Joseph Burstyn, Inc.* v. *Wilson,* 343 U. S. 495 (1952), and thus we start with the premise that "[p]recision of regulation must be the touchstone," *NAACP* v. *Button,* 371 U. S. 415, 438 (1963). And while it is true that this Court refused to strike down, against a broad and generalized attack, a prior restraint requirement that motion pictures be submitted to censors in advance of exhibition, *Times Film Corp.* v. *City of Chicago,* 365 U. S. 43 (1961), there has been no retreat in this area from rigorous insistence upon procedural safeguards and judicial superintendence of the censor's action. See *Freedman* v. *Maryland,* 380 U. S. 51 (1965).[9]

In *Winters* v. *New York,* 333 U. S. 507 (1948), this Court struck down as vague and indefinite a statutory standard interpreted by the state court to be "criminal news or stories of deeds of bloodshed or lust, so massed as to become vehicles for inciting violent and depraved crimes . . . ." *Id.,* at 518. In *Joseph Burstyn, Inc.* v. *Wilson,. supra,* the Court dealt with a film licensing standard of "sacrilegious," which was found to have such an all-inclusive definition as to result in "substantially unbridled censorship." 343 U. S., at 502. Following

---

[9] See also *Teitel Film Corp.* v. *Cusack, ante,* p. 139.

*Burstyn,* the Court held the following film licensing standards to be unconstitutionally vague: "of such character as to be prejudicial to the best interests of the people of said City," *Gelling* v. *Texas,* 343 U. S. 960 (1952); "moral, educational or amusing and harmless," *Superior Films, Inc.* v. *Department of Education,* 346 U. S. 587 (1954); "immoral," and "tend to corrupt morals," *Commercial Pictures Corp.* v. *Regents,* 346 U. S. 587 (1954); "approve such films . . . [as] are moral and proper; . . . disapprove such as are cruel, obscene, indecent or immoral, or such as tend to debase or corrupt morals," *Holmby Productions, Inc.* v. *Vaughn,* 350 U. S. 870 (1955).[10]   See also *Kingsley Int'l Pictures Corp.* v. *Regents,* 360 U. S. 684, 699–702 (Clark, J., concurring in result).

The vice of vagueness is particularly pronounced where expression is sought to be subjected to licensing.   It may be unlikely that what Dallas does in respect to the licensing of motion pictures would have a significant effect

---

[10] There are numerous state cases to the same effect. See, *e. g., Police Commissioner* v. *Siegel Enterprises, Inc.,* 223 Md. 110, 162 A. 2d 727, cert. denied, 364 U. S. 909 (1960) ("violent bloodshed, lust or immorality or which, for a child below the age of eighteen, are obscene, lewd, lascivious, filthy, indecent or disgusting and so presented as reasonably to tend to incite such a child to violence or depraved or immoral acts"); *People* v. *Kahan,* 15 N. Y. 2d 311, 206 N. E. 2d 333 (1965); *People* v. *Bookcase, Inc.,* 14 N. Y. 2d 409, 201 N. E. 2d 14 (1964) ("descriptions of illicit sex or sexual immorality"); *Hallmark Productions, Inc.* v. *Carroll,* 384 Pa. 348, 121 A. 2d 584 (1956) ("sacrilegious, obscene, indecent, or immoral, or such as tend . . . to debase or corrupt morals").   In *Paramount Film Distributing Corp.* v. *City of Chicago,* 172 F. Supp. 69 (D. C. N. D. Ill. 1959), it was alternatively held that the standard "tends toward creating a harmful impression on the minds of children" was indefinite; that provision had no further legislative or judicial definition and is therefore unlike the statute in *Ginsberg* v. *New York, ante,* at 643, where the phrase "harmful to minors" is specifically and narrowly defined in accordance with tests this Court has set forth for judging obscenity.

upon film makers in Hollywood or Europe. But what Dallas may constitutionally do, so may other cities and States. Indeed, we are told that this ordinance is being used as a model for legislation in other localities. Thus, one who wishes to convey his ideas through that medium, which of course includes one who is interested not so much in expression as in making money, must consider whether what he proposes to film, and how he proposes to film it, is within the terms of classification schemes such as this. If he is unable to determine what the ordinance means, he runs the risk of being foreclosed, in practical effect, from a significant portion of the movie-going public. Rather than run that risk, he might choose nothing but the innocuous, perhaps save for the so-called "adult" picture. Moreover, a local exhibitor who cannot afford to risk losing the youthful audience when a film may be of marginal interest to adults—perhaps a "Viva Maria"—may contract to show only the totally inane. The vast wasteland that some have described in reference to another medium might be a verdant paradise in comparison. The First Amendment interests here are, therefore, broader than merely those of the film maker, distributor, and exhibitor, and certainly broader than those of youths under 16.

Of course, as the Court said in *Joseph Burstyn, Inc.* v. *Wilson,* 343 U. S., at 502, "[i]t does not follow that the Constitution requires absolute freedom to exhibit every motion picture of every kind at all times and all places." What does follow at the least, as the cases above illustrate, is that the restrictions imposed cannot be so vague as to set "the censor . . . adrift upon a boundless sea . . . ," *id.,* at 504. In short, as Justice Frankfurter said, "legislation must not be so vague, the language so loose, as to leave to those who have to apply it too wide a discretion . . . ," *Kingsley Int'l Pictures Corp.* v. *Regents,* 360 U. S., at 694 (concurring in result), one reason being

that "where licensing is rested, in the first instance, in an administrative agency, the available judicial review is in effect rendered inoperative [by vagueness]," *Joseph Burstyn, Inc.* v. *Wilson, supra,* at 532 (concurring opinion). Thus, to the extent that vague standards do not sufficiently guide the censor, the problem is not cured merely by affording *de novo* judicial review. Vague standards, unless narrowed by interpretation, encourage erratic administration whether the censor be administrative or judicial; "individual impressions become the yardstick of action, and result in regulation in accordance with the beliefs of the individual censor rather than regulation by law," *Kingsley Int'l Pictures Corp.* v. *Regents, supra,* at 701 (Clark, J., concurring in result).[11]

The dangers inherent in vagueness are strikingly illustrated in these cases. Five members of the Board viewed "Viva Maria." Eight members voted to classify it as "not suitable for young persons," the ninth member not voting. The Board gave no reasons for its determination.[12] Appellee alleged in its petition for an injunc-

---

[11] See also Amsterdam, Note, The Void-for-Vagueness Doctrine in the Supreme Court, 109 U. Pa. L. Rev. 67, 90 (1960); Klein, Film Censorship: The American and British Experience, 12 Vill. L. Rev. 419, 428 (1967).

[12] The ordinance does not require the Board to give reasons for its action. Compare *ACLU* v. *City of Chicago,* 13 Ill. App. 2d 278, 286, 141 N. E. 2d 56, 60 (1957):

"[T]he censoring authority, in refusing to issue a permit for showing the film, should be obliged to specify reasons for so doing . . . . The trial court, as well as the reviewing court, would then have a record, in addition to the film itself, on which to decide whether the ban should be approved. . . . Without such procedure, the courts become, not only the final tribunal to pass upon films, but the only tribunal to assume the responsibilities of the censoring authority."

Accord, *Zenith Int'l Film Corp.* v. *City of Chicago,* 291 F. 2d 785 (C. A. 7th Cir. 1961). See also Note, 71 Harv. L. Rev. 326, 338 (1957).

tion that the classification was warranted because the film portrayed "sexual promiscuity in such a manner as to be in the judgment of the Board likely to incite or encourage delinquency or sexual promiscuity on the part of young persons or to appeal to their prurient interests." Two Board members, a clergyman and a lawyer, testified at the hearing. Each adverted to several scenes in the film which, in their opinion, portrayed male-female relationships in a way contrary to "acceptable and approved behavior." Each acknowledged, in reference to scenes in which clergymen were involved in violence, most of which was farcical, that "sacrilege" might have entered into the Board's determination. And both conceded that the asserted portrayal of "sexual promiscuity" was implicit rather than explicit, *i. e.,* that it was a product of inference by, and imagination of, the viewer.

So far as "judicial superintendence" [13] and *de novo* review are concerned, the trial judge, after viewing the film and hearing argument, stated merely: "Oh, I realize you gentlemen might be right. There are two or three features in this picture that look to me would be unsuitable to young people. . . . So I enjoin the exhibitor . . . from exhibiting it." [14] Nor did the Court of Civil Appeals provide much enlightenment or a narrowing definition of the ordinance. United Artists argued that the obscenity standards similar to those set forth in *Roth* v. *United States,* 354 U. S. 476 (1957), and other decisions of this Court ought to be controlling.[15] The majority of

---

[13] *Bantam Books, Inc.* v. *Sullivan,* 372 U. S. 58, 70 (1963). See *Freedman* v. *Maryland, supra.*

[14] In response to a request that he make findings, the trial judge stated: "I decline. I have so many irons for a little fellow. I have taken on more than I can do, trying to decide a big case here, and I have got others at home and here and in Hill County where I have been helping out, and I do not have time to do it. I decline."

[15] Appellants also contend here that, in addition to its vagueness, the ordinance is invalid because it authorizes the restraint of films

the Court of Civil Appeals held, alternatively, (1) that such cases were not applicable because the legislation involved in them resulted in suppression of the offending expression rather than its classification; (2) that if obscenity standards were applicable then "Viva Maria" was obscene as to adults (a patently untenable conclusion) and therefore entitled to no constitutional protection; and (3) that if obscenity standards were modified as to children, the film was obscene as to them, a conclusion which was not in terms given as a narrowing interpretation of any specific provision of the ordinance. 402 S. W. 2d 770, 775–776. In regard to the last alternative holding, we must conclude that the court in effect ruled that the "portrayal . . . of sexual promiscuity as acceptable," *id.*, at 775, is in itself obscene as to children.[16] The court also held that the standards of the ordinance were "sufficiently definite." *Ibid.*

Thus, we are left merely with the film and directed to the words of the ordinance. The term "sexual promiscuity" is not there defined[17] and was not interpreted in the state courts. It could extend, depending upon one's moral judgment, from the obvious to any sexual contacts outside a marital relationship. The determina-

on constitutionally impermissible grounds, arguing that the limits on regulation of expression are those of obscenity, or at least obscenity as judged for children. In light of our disposition on vagueness grounds, we do not reach that issue.

[16] A concurring justice of that court, with whom the author of the majority opinion agreed, specifically rejected the view that obscenity standards were relevant at all in determining the limits of the ordinance. But nothing in that opinion clarifies the standards adopted. 402 S. W. 2d, at 777–779.

[17] Appellee adopted an amendment to the ordinance in March 1966, which is not involved here. It defines "sexual promiscuity" as "indiscriminate sexual intimacies beyond the customary limits of candor in the community, and said term as defined herein shall include, but not be limited to sexual intercourse as that term is defined."

tive manner of the "describing or portraying" of the subjects covered by the ordinance (see *supra,* at 681), including "sexual promiscuity," is defined as "such a manner as to be, in the judgment of the Board, likely to incite or encourage delinquency or sexual promiscuity on the part of young persons." A film is so "'likely to incite or encourage' crime delinquency or sexual promiscuity on the part of young persons, if, in the judgment of the Board, there is a substantial probability that it will create the impression on young persons that such conduct is profitable, desirable, acceptable, respectable, praiseworthy or commonly accepted." It might be excessive literalism to insist, as do appellants, that because those last six adjectives are stated in the disjunctive, they represent separate and alternative subtle determinations the Board is to make, any of which results in a not suitable classification. Nonetheless, "[w]hat may be to one viewer the glorification of an idea as being 'desirable, acceptable or proper' may to the notions of another be entirely devoid of such a teaching. The only limits on the censor's discretion is his understanding of what is included within the term 'desirable, acceptable or proper.' This is nothing less than a roving commission . . . ." *Kingsley Int'l Pictures Corp.* v. *Regents,* 360 U. S., at 701 (Clark, J., concurring in result).[18]

Vagueness and the attendant evils we have earlier described, see *supra,* at 683–685, are not rendered less objectionable because the regulation of expression is one of classification rather than direct suppression. Cf. *Bantam*

---

[18] An alternative to "likely to incite" because the portrayal might "create the impression . . . [the] conduct is profitable, desirable," etc., is set forth in the ordinance. That is if the manner of presentation is "likely . . . to appeal to their [young persons'] prurient interest." That alternative, however, was not relied upon by the Board members who testified, nor by the appellate court.

*Books, Inc.* v. *Sullivan,* 372 U. S. 58 (1963).[19]   Nor is it an answer to an argument that a particular regulation of expression is vague to say that it was adopted for the salutary purpose of protecting children.   The permissible extent of vagueness is not directly proportional to, or a function of, the extent of the power to regulate or control expression with respect to children.   As Chief Judge Fuld has said:

> "It is . . . essential that legislation aimed at protecting children from allegedly harmful expression—no less than legislation enacted with respect to adults—be clearly drawn and that the standards adopted be reasonably precise so that those who are governed by the law and those that administer it will understand its meaning and application." *People* v. *Kahan,* 15 N. Y. 2d 311, 313, 206 N. E. 2d 333, 335 (1965) (concurring opinion).[20]

The vices—the lack of guidance to those who seek to adjust their conduct and to those who seek to administer

---

[19] In *Bantam Books,* the Commission there charged with reviewing material "manifestly tending to the corruption of the youth" (372 U. S., at 59) had no direct regulatory or suppressing functions, although its informal sanctions were found to achieve the same result.   The Court held that "system of informal censorship" (*id.,* at 71) to violate the Fourteenth Amendment.   One important factor in that decision was the Commission's "vague and uninformative" mandate, which the Commission in practice had "done nothing to make . . . more precise." *Ibid.* See also I. Carmen, Movies, Censorship, and the Law, *passim* (1966); Klein, Film Censorship: The American and British Experience, 12 Vill. L. Rev. 419, 455 (1967); Note, 71 Harv. L. Rev. 326, 342 (1957).

[20] See also, *e. g., Katzev* v. *County of Los Angeles,* 52 Cal. 2d 360, 341 P. 2d 310 (1959) (magazine sales to minors under age 18); *People* v. *Bookcase, Inc., supra,* n. 10 (book sales to minors under age 18); *Police Commissioner* v. *Siegel Enterprises, Inc., supra,* n. 10 (sale of certain publications to those under 18); *Paramount Film Distributing Corp.* v. *City of Chicago, supra,* n. 10 (special license for films deemed objectionable for those under age 21).

the law, as well as the possible practical curtailing of the effectiveness of judicial review—are the same.

It is not our province to draft legislation. Suffice it to say that we have recognized that some believe "motion pictures possess a greater capacity for evil, particularly among the youth of a community, than other modes of expression," *Joseph Burstyn, Inc.* v. *Wilson, supra,* at 502, and we have indicated more generally that because of its strong and abiding interest in youth, a State may regulate the dissemination to juveniles of, and their access to, material objectionable as to them, but which a State clearly could not regulate as to adults. *Ginsberg* v. *New York, ante,* p. 629.[21] Here we conclude only that "the absence of narrowly drawn, reasonable and definite standards for the officials to follow," *Niemotko* v. *Maryland,* 340 U. S. 268, 271 (1951), is fatal.[22]

---

[21] On age classification with regard to viewing motion pictures, see generally I. Carmen, Movies, Censorship, and the Law 247–260 (1966); Note, 69 Yale L. J. 141 (1959).

[22] Appellants also assert that the city ordinance violates the teachings of *Freedman* v. *Maryland, supra,* because it does not secure prompt state appellate review. The assurance of a "prompt final judicial decision" (380 U. S., at 59) is made here, we think, by the guaranty of a speedy determination in the trial court (in this case nine days after the Board's classification). See *Teitel Film Corp.* v *Cusack, ante,* p. 139. Nor is *Freedman* violated by the requirement that the exhibitor file a notice of nonacceptance of the Board's classification. To be sure, it is emphasized in *Freedman* that "only a procedure requiring a judicial determination suffices to impose a valid final restraint" (380 U. S., at 58), and here if the exhibitor chooses not to file the notice of nonacceptance, the Board's determination is final without judicial approval. But we are not constrained to view that procedure as invalid in the absence of a showing that it has any significantly greater effect than would the exhibitor's decision not to contest in court the Board's suit for a temporary injunction. The ordinance provides that the Board has the burden of going to court to seek a temporary injunction, once

The judgment of the Texas Court of Civil Appeals is reversed and the cases are remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

## APPENDIX TO OPINION OF THE COURT.

Chapter 46A of the 1960 Revised Code of Civil and Criminal Ordinances of the City of Dallas, as amended, provides:

Section 46A–1. *Definition of Terms:*

(a) "Film" means any motion picture film or series of films, whether full length or short subject, but does not include newsreels portraying actual current events or pictorial news of the day.

(b) "Exhibit" means to project a film at any motion picture theatre or other public place within the City of Dallas to which tickets are sold for admission.

(c) "Exhibitor" means any person, firm or corporation which exhibits a film.

(d) "Young person" means any person who has not attained his sixteenth birthday.

(e) "Board" means the Dallas Motion Picture Classification Board established by Section 46A–2 of this ordinance.

(f) "Not suitable for young persons" means:

(1) Describing or portraying brutality, criminal violence or depravity in such a manner as to be, in the judg-

---

the exhibitor has indicated his nonacceptance, and there it has the burden of sustaining its classification.

Finally, appellant United Artists contends the ordinance unconstitutionally infringes upon its rights by not providing for participation by a distributor, who might wish to contest where an exhibitor would not. Of course the distributor must be permitted to challenge the classification, cf. *Bantam Books, Inc.* v. *Sullivan,* 372 U. S. 58, 64, n. 6 (1963), but the appellee assures us he may (see n. 2, *supra*), and United Artists was permitted to intervene in the trial court.

ment of the Board, likely to incite or encourage crime or delinquency on the part of young persons; or

(2) Describing or portraying nudity beyond the customary limits of candor in the community, or sexual promiscuity or extra-marital or abnormal sexual relations in such a manner as to be, in the judgment of the Board, likely to incite or encourage delinquency or sexual promiscuity on the part of young persons or to appeal to their prurient interest.

A film shall be considered "likely to incite or encourage" crime delinquency or sexual promiscuity on the part of young persons, if, in the judgment of the Board, there is a substantial probability that it will create the impression on young persons that such conduct is profitable, desirable, acceptable, respectable, praiseworthy or commonly accepted. A film shall be considered as appealing to "prurient interest" of young persons, if in the judgment of the Board, its calculated or dominant effect on young persons is substantially to arouse sexual desire. In determining whether a film is "not suitable for young persons," the Board shall consider the films as a whole, rather than isolated portions, and shall determine whether its harmful effects outweigh artistic or educational values such film may have for young persons.

(g) "Classify" means to determine whether a film is:

(1) Suitable for young persons, or;

(2) Not suitable for young persons.

(h) "Advertisement" means any commercial promotional material initiated by an exhibitor designed to bring a film to public attention or to increase the sale of tickets to exhibitions of same, whether by newspaper, billboard, motion picture, television, radio, or other media within or originating within the City of Dallas.

(i) "Initial exhibition" means the first exhibition of any film within the City of Dallas.

(j) "Subsequent exhibition" means any exhibition subsequent to the initial exhibition, whether by the same or a different exhibitor.

(k) "File" means to deliver to the City Secretary for safekeeping as a public record of the City of Dallas.

(l) "Classification order" means any written determination by a majority of the Board classifying a film, or granting or refusing an application for change of classification.

(m) The term "Board" as used and applied in subsection (a) of Section 46A–7 shall include the City of Dallas when attempting to enforce this ordinance and the City Attorney of the City of Dallas when representing the Board or the City of Dallas.

Section 46A–2. *Establishment of Board:*

There is hereby created a Board to be known as the Dallas Motion Picture Classification Board which shall be composed of a Chairman and Eight Members to be appointed by the Mayor and City Council of the City of Dallas, whose terms shall be the same as members of the City Council. Such members shall serve without pay and shall adopt such rules and regulations as they deem best governing their action, proceeding and deliberations and time and place of meeting. These rules and regulations shall be subject to approval of the City Council. If a vacancy occurs upon the Board by death, resignation or otherwise, the governing body of the City of Dallas shall appoint a member to fill such vacancy for the unexpired term.

The Chairman and all Members of the Board shall be good, moral, law-abiding citizens of the City of Dallas, and shall be chosen so far as reasonably practicable in such a manner that they will represent a cross section of the community. Insofar as practicable, the members appointed to the Board shall be persons educated and ex-

perienced in one or more of the following fields: art, drama, literature, philosophy, sociology, psychology, history, education, music, science or other related fields. The City Secretary shall act as Secretary of the Board.

Section 46A–3. *Classification Procedure:*

(a) Before any initial exhibition, the exhibitor shall file a proposed classification of the film to be exhibited, stating the title of the film and the name of the producer, and giving a summary of the plot and such other information as the Board may by rule require, together with the classification proposed by the exhibitor. The Board shall examine such proposed classification, and if it approves same, shall mark it "approved" and file it as its own classification order. If the Board fails to act, that is, either file a classification order or hold a hearing within five (5) days after such proposed classification is filed, the proposed classification shall be considered approved.

(b) If upon examination of the proposed classification a majority of the Board is not satisfied that it is proper, the Chairman shall direct the exhibitor to project the film before any five (5) or more members of the Board, at a suitably equipped place and at a specified time, which shall be the earliest time practicable with due regard to the availability of the film. The exhibitor, or his designated representative, may at such time make such statement to the Board in support of his proposed classification and present such testimony as he may desire. Within two (2) days, the Board shall make and file its classification of the film in question.

(c) Any initial or subsequent exhibitor may file an application for a change in the classification of any film previously classified. No exhibitor shall be allowed to file more than one (1) application for change of classification of the same film. Such application shall contain a sworn statement of the grounds upon which the appli-

cation is based. Upon filing of such application, the City Secretary shall bring it immediately to the attention of the Chairman of the Board, who upon application by the exhibitor shall set a time and place for a hearing and shall notify the applicants and all interested parties, including all exhibitors who may be exhibiting or preparing to exhibit the film. The Board shall view the film and at such hearing, hear the statements of all interested parties, and any proper testimony that may be offered, and shall within two (2) days thereafter make and file its order approving or changing such classification. If the classification of a film is changed as a result of such hearing to the classification "not suitable for young persons," the exhibitors showing the film shall have seven (7) days in which to alter their advertising and audience policy to comply with such classification.

(d) Upon filing by the Board of any classification order, the City Secretary shall immediately issue and mail a notice of classification to the exhibitor involved and to any other exhibitor who shall request such notice.

(e) A classification shall be binding on any subsequent exhibitor unless and until he obtains a change of classification in the manner above provided.

Section 46A–4. *Offenses:*

(a) It shall be unlawful for any exhibitor or his employee:

(1) To exhibit any film which has not been classified as provided in this ordinance.

(2) To exhibit any film classified "not suitable for young persons" if any current advertisement of such film by such exhibitor fails to state clearly the classification of such film.

(3) To exhibit any film classified "not suitable for young persons" without keeping such classification posted

prominently in front of the theatre in which such film is being exhibited.

(4) Knowingly to sell or give to any young person a ticket to any film classified "not suitable for young persons."

(5) Knowingly to permit any young person to view the exhibition of any film classified "not suitable for young persons."

(6) To exhibit any film classified "not suitable for young persons" or any scene or scenes from such a film, or from an unclassified film, whether moving or still, in the same theatre and on the same program with a film classified "suitable for young persons"; provided that any advertising preview or trailer containing a scene or scenes from an unclassified film or a film classified "not suitable for young persons" may be shown at any time if same has been separately classified as "suitable for young persons" under the provisions of Section 46A–3 of this ordinance.

(7) To make any false or willfully misleading statement in any proposed classification, application for change of classification, or any other proceeding before the Board.`

(8) To exhibit any film classified "not suitable for young persons" without having in force the license hereinafter provided.

(b) It shall be unlawful for any young person:

(1) To give his age falsely as sixteen (16) years of age or over, for the purpose of gaining admittance to an exhibition of a film classified "not suitable for young persons."

(2) To enter or remain in the viewing room of any theatre where a film classified "not suitable for young persons" is being exhibited.

(3) To state falsely that he or she is married for the purpose of gaining admittance to an exhibition of a film classified as "not suitable for young persons."

(c) It shall be unlawful for any person:

(1) To sell or give any young person a ticket to an exhibition of a film classified "not suitable for young persons."

(2) To make any false or willfully misleading statement in an application for change of classification or in any proceeding before the Board.

(3) To make any false statements for the purpose of enabling any young person to gain admittance to the exhibition of a film classified as "not suitable for young persons."

(d) To the extent that any prosecution or other proceeding under this ordinance, involves the entering, purchasing of a ticket, or viewing by a young person of a film classified "not suitable for young persons," it shall be a valid defense that such young person was accompanied by his parent or legally appointed guardian, husband or wife, throughout the viewing of such film.

Section 46A–5. *License:*

Every exhibitor holding a motion picture theatre or motion picture show license issued pursuant to Chapter 46 of the 1960 Revised Code of Civil and Criminal Ordinances of the City of Dallas shall be entitled to issuance of a license by the City Secretary to exhibit films classified "not suitable for young persons."

Section 46A–6. *Revocation or suspension of license:*

Whenever the City Attorney or any person acting under his direction, or any ten (10) citizens of the City of Dallas, shall file a sworn complaint with the City Secretary stating that any exhibitor has repeatedly violated the provisions of this ordinance, or that any

exhibitor has persistently failed to use reasonable diligence to determine whether those seeking admittance to the exhibition of a film classified "not suitable for young persons" are below the age of sixteen (16), the City Secretary shall immediately bring such complaint to the attention of the City Council who shall set a time and place for hearing such complaint and cause notice of such hearing to be given to the complainants and to the exhibitor involved. The City Council shall have authority to issue subpoenas requiring witnesses to appear and testify at such hearing, and any party to such hearing shall be entitled to such process. If, after hearing the evidence, the City Council shall find the charges in such complaint to be true, it shall issue and file an order revoking or suspending the license above provided, insofar as it grants the privilege of showing such classified pictures, for a specific period not to exceed one (1) year, or may issue a reprimand if it is satisfied that such violation will not continue.

The City Council likewise, after notice and hearing, may revoke or suspend the license of any exhibitor who has refused or unreasonably failed to produce or delayed the submission of a film for review, when requested by the Board.

Section 46A–7. *Judicial Review:*

(a) Within two (2) days after the filing of any classification by the Board, other than an order approving the classification proposed by an exhibitor; any exhibitor may file a notice of non-acceptance of the Board's classification, stating his intention to exhibit the film in question under a different classification. Thereupon it shall be the duty of the Board to do the following:

(1) Within three (3) days thereafter to make application to a District Court of Dallas County, Texas, for a temporary and a permanent injunction to enjoin such

defendant-exhibitor, being the exhibitor who contests the classification, from exhibiting the film in question contrary to the provisions of this ordinance.

(2) To have said application for temporary injunction set for hearing within five (5) days after the filing thereof. In the event the defendant-exhibitor appears at or before the time of the hearing of such temporary injunction, waives the notice otherwise provided by the Texas Rules of Civil Procedure, and requests that at the time set for such hearing the Court proceed to hear the case under the Texas Rules of Civil Procedure for permanent injunction on its merits, the Board shall be required to waive its application for temporary injunction and shall join in such request. In the event the defendant-exhibitor does not waive notice and/or does not request an early hearing on the Board's application for permanent injunction, it shall nevertheless be the duty of the board to obtain the earliest possible setting for such hearing under the provisions of State law and the Texas Rules of Civil Procedure.

(3) If the injunction is granted by the trial court and the defendant-exhibitor appeals to the Court of Civil Appeals, the Board shall waive any and all statutory notices and times as provided for in the Texas State Statutes and Texas Rules of Civil Procedure, and shall within five (5) days after receiving a copy of appealing exhibitor's brief, file its reply brief, if required, and be prepared to submit the case upon oral submission or take any other reasonable action requested by the appealing exhibitor to expedite the submission of the case to the Court of Civil Appeals, and shall upon request of the appealing exhibitor, jointly with such exhibitor, request the Court of Civil Appeals to advance the cause upon the docket and to give it a preferential setting the same as is afforded an appeal from a temporary injunction or other preferential matters.

(4) If the Court of Civil Appeals should by its judgment affirm the judgment of the trial court granting the injunction and the appealing exhibitor should file an application for writ of error to the Texas Supreme Court, the Board shall be required to waive any and all notices and times as provided for in the Texas State Statutes and the Texas Rules of Civil Procedure, and shall within five (5) days after receiving a copy of the application for writ of error, file its reply brief, if required, and be prepared to submit the case upon oral submission or take any other reasonable action requested by the appealing exhibitor to expedite the submission of the case to the Supreme Court and shall upon request of the appealing exhibitor, jointly with such exhibitor, request the Supreme Court to advance the cause upon the docket and to give it a preferential setting the same as is afforded an appeal from a temporary injunction or other preferential matters.

(5) If the District Court denies the Board's application for injunction, and the Board elects to appeal, the Board shall be required to waive all periods of time allowed it by the Texas Rules of Civil Procedure and if a motion for a new trial is required, shall file said motion within two (2) days after the signing of the judgment, (or on the following Monday if said period ends on a Saturday or Sunday, or on the day following if the period ends on a Legal Holiday), shall not amend said motion and shall obtain a hearing on such motion within five (5) days time. If no motion for new trial is required as a prerequisite to an appeal under the Texas Rules of Civil Procedure, the Board shall not file such a motion. Within ten (10) days after the judgment is signed by the District Court denying such injunction or within ten (10) days after the order overruling the Board's motion for new trial is signed, if such motion is required, the Board shall complete all steps neces-

sary for the perfection of its appeal to the Court of Civil Appeals, including the filing of the Transcript, Statement of Facts and Appellant's brief. Failure to do so shall constitute an abandonment of the appeal. On filing the record with the Court of Civil Appeals, the Board shall file a motion to advance requesting the Court to give a preferential setting the same as is afforded an appeal from a temporary injunction or other preferential matters.

(6) If the Court of Civil Appeals reverses the trial court after the trial court has granted an injunction, or if the Court of Civil Appeals refuses to reverse the trial court after that court has failed to grant an injunction, then if the Board desires to appeal from the decision of the Court of Civil Appeals by writ of error to the Supreme Court of the State of Texas, it must file its motion for rehearing within two (2) days of rendition of the decision of the Court of Civil Appeals (or on the following Monday, if said period ends on a Saturday or Sunday, or on the day following if the period ends on a Legal Holiday), and shall file its application for writ of error within ten (10) days after the Court of Civil Appeals' order overruling such motion for rehearing, and failure to do so shall waive all rights to appeal from the decision of the Court of Civil Appeals. At the time of filing the application for writ of error, the Board shall also request the Supreme Court to give the case a preferential setting and advance the same on the docket.

(b) The filing of such notice of non-acceptance shall not suspend or set aside the Board's order, but such order shall be suspended at the end of ten (10) days after the filing of such notice unless an injunction is issued within such period.

(c) Failure of any exhibitor to file the notice of non-acceptance within two (2) days as required in Subdivision (1) of this Section 46A–7, shall constitute acceptance

of such classification order and such exhibitor shall be bound by such order in all subsequent proceedings except such proceedings as may be had in connection with any application for change of classification under Subsection (c) of Section 46A–3 above.

Section 46A–8. *Public Nuisances:*

The following acts are declared to be public nuisances:

(a) Any violation of Subdivisions (1), (2), (3), or (6), of Subdivision (a) of Section 46A–4 of this ordinance.

(b) Any exhibition of a film classified as "not suitable for young persons" at which more than three (3) young persons are admitted.

(c) Any exhibition of a film classified as "not suitable for young persons" by an exhibitor who fails to use reasonable diligence to determine whether persons admitted to such exhibitions are persons under the age of sixteen (16) years.

(d) Any exhibition of a film classified as "not suitable for young persons" by an exhibitor who has been convicted of as many as three (3) violations of Subdivisions (4) or (5) of Subdivision (a) of Section 46A–4 of this ordinance in connection with the exhibition of the same film.

Section 46A–9. *Injunctions:*

Whenever the Board has probable cause to believe that any exhibitor has committed any of the acts declared in Section 46A–8 above to be a public nuisance, the Board shall have the duty to make application to a court of competent jurisdiction for an injunction restraining the commission of such acts.

Section 46A–10. *Exemption to State Law:*

Nothing in this ordinance shall be construed to regulate public exhibitions pre-empted by Article 527 of the Penal Code of the State of Texas, as amended.

Section 46A–11. *Severability Clause:*

Should any section, subsection, sentence, provision, clause or phrase be held to be invalid for any reason, such holding shall not render invalid any other section, subsection, sentence, provision, clause or phrase of this ordinance, and the same are deemed severable for this purpose.

SECTION 2. That any person who shall violate any provisions of this ordinance shall be guilty of a misdemeanor and upon conviction thereof shall be subject to a fine not to exceed Two Hundred Dollars ($200.00) and each offense shall be deemed to be a separate violation and punishable as a separate offense, and each day that a film is exhibited which has not been classified according to this ordinance shall be a separate offense.

SECTION 3. That Ordinance No. 10963 heretofore enacted by the City Council of the City of Dallas on April 5, 1965, be and the same is hereby in all things repealed and held for naught, and this ordinance is enacted in lieu thereof.

SECTION 4. The fact that Ordinance No. 10963 previously passed by the City Council of the City of Dallas has been declared to be unenforceable in the Courts by the Federal District Court, creates an urgency and an emergency in the preservation of the public peace, comfort and general welfare and requires that this ordinance shall take effect immediately from and after its passage, and it is accordingly so ordained.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK joins, concurring.

As I indicated in my dissenting opinion in *Ginsberg* v. *New York, ante,* p. 650, if we assume *arguendo* that the censorship of obscene publications, whether for children or for adults, is in the area of substantive due proc-

ess, the States have a very wide range indeed for determining what kind of movie, novel, poem, or article is harmful. If that were the test, I would agree with my Brother HARLAN that the standard of "sexual promiscuity" in this Dallas ordinance is sufficiently precise and discriminating for modern man to apply intelligently.

My approach to these problems is, of course, quite different. I reach the result the Court reaches for the reasons stated in my dissenting opinions in *Ginsberg* and other cases and therefore concur in reversing the present judgment.

MR. JUSTICE HARLAN, concurring in No. 47, *ante,* p. 629, and dissenting in Nos. 56 and 64.

These cases usher the Court into a new phase of the intractable obscenity problem: may a State prevent the dissemination of obscene or other obnoxious material to juveniles upon standards less stringent than those which would govern its distribution to adults?

In No. 47, the *Ginsberg* case, the Court upholds a New York statute applicable only to juveniles which, as construed by the state courts, in effect embodies in diluted form the "adult" obscenity standards established by *Roth* v. *United States,* 354 U. S. 476, and the prevailing opinion in *Memoirs* v. *Massachusetts,* 383 U. S. 413. In Nos. 56 and 64, the *Interstate Circuit* and *United Artists* cases, the Court strikes down on the ground of vagueness a similar Dallas ordinance, not couched, however, entirely in obscenity terms. In none of these cases does the Court pass judgment on the particular material condemned by the state courts.

As the Court enters this new area of obscenity law it is well to take stock of where we are at present in this constitutional field. The subject of obscenity has produced a variety of views among the members of the Court unmatched in any other course of constitutional

adjudication.[1]  Two members of the Court steadfastly maintain that the First and Fourteenth Amendments render society powerless to protect itelf against the dissemination of even the filthiest materials.[2]  No other member of the Court, past or present, has ever stated his acceptance of that point of view.  But there is among present members of the Court a sharp divergence as to the proper application of the standards in *Roth, supra,*[3] *Memoirs, supra,*[4] and *Ginzburg* v. *United States,* 383 U. S. 463,[5] for judging whether given material is con-

[1] In the following 13 obscenity cases from the date *Roth* was decided, in which signed opinions were written for a decision or judgment of the Court, there has been a total of 55 separate opinions among the Justices. *Kingsley Books, Inc.* v. *Brown,* 354 U. S. 436 (four opinions); *Roth* v. *United States, supra* (four opinions); *Kingsley Int'l Pictures Corp.* v. *Regents,* 360 U. S. 684 (six opinions); *Smith* v. *California,* 361 U. S. 147 (five opinions); *Times Film Corp.* v. *Chicago,* 365 U. S. 43 (three opinions); *Marcus* v. *Search Warrant,* 367 U. S. 717 (two opinions); *Manual Enterprises* v. *Day,* 370 U. S. 478 (three opinions); *Bantam Books, Inc.* v. *Sullivan,* 372 U. S. 58 (four opinions); *Jacobellis* v. *Ohio,* 378 U. S. 184 (six opinions); *A Quantity of Books* v. *Kansas,* 378 U. S. 205 (four opinions); *Memoirs* v. *Massachusetts, supra* (five opinions); *Ginzburg* v. *United States,* 383 U. S. 463 (five opinions); *Mishkin* v. *New York,* 383 U. S. 502 (four opinions).

[2] See *Roth* v. *United States, supra,* at 508 (dissenting opinion); *Jacobellis* v. *Ohio, supra,* at 196 (separate opinion); *Ginzburg* v. *United States, supra,* at 476, 482 (dissenting opinions).

[3] *Roth* stated the test to be "whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest.". 354 U. S., at 489 (note omitted).

[4] *Memoirs* elaborated the *Roth* test as follows: "it must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value." 383 U. S., at 418.

[5] The *Ginzburg* "test" is difficult to state with any precision. The Court held that "in close cases evidence of pandering may be

stitutionally protected or unprotected. Most of the present Justices who believe that "obscenity" is not beyond the pale of governmental control seemingly consider that the *Roth-Memoirs-Ginzburg* tests permit suppression of material that falls short of so-called "hard core pornography," on equal terms as between federal and state authority.[6] Another view is that only "hard core pornography" may be suppressed, whether by federal or state authority.[7] And still another view, that of this writer, is that only "hard core pornography" may be suppressed by the Federal Government, whereas under the Fourteenth Amendment States are permitted wider authority to deal with obnoxious matter than might be justifiable under a strict application of the *Roth-Memoirs-Ginzburg* rules.[8]

There are also differences among us as to how our appellate process should work in reviewing obscenity determinations. One view is that we should simply examine the proceedings below to ascertain whether the lower federal or state courts have made a genuine effort to apply the *Roth-Memoirs-Ginzburg* tests, and that if such is the case, their determinations that the questioned

---

probative with respect to the nature of the material in question and thus satisfy the *Roth* test." 383 U. S., at 474. But this "simply elaborates the test by which the obscenity vel non of the material must be judged." *Id.*, at 475. Yet evidence of pandering may "support the determination that the material is obscene even though in other contexts the material would escape such condemnation." *Id.*, at 476. Pandering itself evidently encompasses every form of the " 'business of purveying textual or graphic matter openly advertised to appeal to the erotic interest of their customers.' " *Id.*, at 467 (note omitted).

[6] See, *e. g., Jacobellis* v. *Ohio, supra,* at 193–195 (opinion of BRENNAN, J.).

[7] See *id.*, at 197 (concurring opinion of STEWART, J.).

[8] See *Roth* v. *United States, supra,* at 496 (concurring and dissenting opinion); *Memoirs* v. *Massachusetts, supra,* at 455 (dissenting opinion).

material is obscene should be accepted, much as would any findings of fact.[9]  Another view is that the question of whether particular material is obscene inherently entails a constitutional judgment for which the Court has ultimate responsibility, and hence that it is incumbent upon us to judge for ourselves, *de novo* as it were, the obscenity *vel non* of the challenged matter.[10]

The upshot of all this divergence in viewpoint is that anyone who undertakes to examine the Court's decisions since *Roth* which have held particular material obscene or not obscene would find himself in utter bewilderment.[11] From the standpoint of the Court itself the current approach has required us to spend an inordinate amount of time in the absurd business of perusing and viewing the miserable stuff that pours into the Court, mostly in state cases, all to no better end than second-guessing state judges.  In all except rare instances, I venture to say, no substantial free-speech interest is at stake, given the right of the States to control obscenity.

I believe that no improvement in this chaotic state of affairs is likely to come until it is recognized that this whole problem is primarily one of state concern, and

---

[9] See *Jacobellis* v. *Ohio, supra,* at 202 (dissenting opinion).

[10] See *Jacobellis,* at 190 (opinion of BRENNAN, J.) ; *Roth* v. *United States, supra,* at 497–498 (concurring and dissenting opinion); *Kingsley Int'l Pictures Corp.* v. *Regents, supra,* at 708 (concurring in result).

[11] See, *e. g., Keney* v. *New York,* 388 U. S. 440; *Friedman* v. *New York,* 388 U. S. 441; *Ratner* v. *California,* 388 U. S. 442; *Cobert* v. *New York,* 388 U. S. 443; *Sheperd* v. *New York,* 388 U. S. 444; *Avansino* v. *New York,* 388 U. S. 446; *Aday* v. *United States,* 388 U. S. 447; *Corinth Publications, Inc.* v. *Wesberry,* 388 U. S. 448; *Books, Inc.* v. *United States,* 388 U. S. 449; *Rosenbloom* v. *Virginia,* 388 U. S. 450; *A Quantity of Copies of Books* v. *Kansas,* 388 U. S. 452; *Mazes* v. *Ohio,* 388 U. S. 453; *Schackman* v. *California,* 388 U. S. 454; *Landau* v. *Fording,* 388 U. S. 456; *Potomac News Co.* v. *United States,* 389 U. S. 47; *Conner* v. *City of Hammond,* 389 U. S. 48; *Central Magazine Sales, Ltd.* v. *United States,* 389 U. S. 50; *Chance* v. *California,* 389 U. S. 89.

that the Constitution tolerates much wider authority and discretion in the States to control the dissemination of obscene materials than it does in the Federal Government. Reiterating the viewpoint that I have expressed in earlier opinions, I would limit federal control of obscene materials to those which all would recognize as what has been called "hard core pornography," and would withhold the federal judicial hand from interfering with state determinations except in instances where the state action clearly appears to be but the product of prudish overzealousness. See *Roth* v. *United States, supra,* at 496; *Manual Enterprises* v. *Day,* 370 U. S. 478; *Jacobellis* v. *Ohio,* 378 U. S. 184, 203; *Memoirs* v. *Massachusetts, supra,* at 455. And in the juvenile field I think that the Constitution is still more tolerant of state policy and its applications. If current doctrinaire views as to the reach of the First Amendment into state affairs are thought to stand in the way of such a functional approach, I would revert to basic constitutional concepts that until recent times have been recognized and respected as the fundamental genius of our federal system, namely the acceptance of wide state autonomy in local affairs.

I come now to the cases at hand. In No. 47, *Ginsberg,* I concur in the judgment and join the opinion of the Court, fully preserving, however, the views repeatedly expressed in my earlier opinions in this field.

In Nos. 56 and 64, the *Interstate Circuit* and *United Artists* cases, I respectfully dissent. I do not agree that the Dallas ordinance can be struck down, as the Court now holds, on the score of vagueness. The ambiguities about which the Court expresses concern are essentially two.[12] First, the ordinance does not include a definition

---

[12] The Court emphasizes at greater length the failure of the Board and the Texas courts to proffer any clarification of the ordinance. This compels examination of the ordinance's terms, but it does

of "sexual promiscuity." [13]  Second, the ordinance pro-
vides that a film "shall be considered 'likely to incite or
encourage' crime delinquency or sexual promiscuity . . .
if, in the judgment of the Board, there is a substantial
probability that it will create the impression on young
persons that such conduct is profitable, desirable, accept-
able, respectable, praiseworthy or commonly accepted."
The Court is concerned that many may disagree as to
whether any specific materials create such impressions on
young persons.

These seem to me entirely inadequate grounds on
which to strike down the ordinance.  It must be granted,
of course, that people may differ as to the application
of these standards; but the central lesson of this Court's
efforts in this area is that under all verbal formulae,
including even this Court's own definition of obscenity,
reasonable men can, and ordinarily do, differ as to the
proper assessment of challenged materials.  The truth
is that the Court has demanded greater precision of lan-
guage from the City of Dallas than the Court can itself
give, or even than can sensibly be expected in this area
of the law.

The Court has not always asked so much. [14]  In *Roth,*
the federal statute under which the petitioner had been

---

not, of course, offer any independent basis for a conclusion that
the ordinance is ambiguous.

[13] The Court acknowledges that the city has since adopted a
definition of sexual promiscuity, but it expresses no views as to
the definition's adequacy.

[14] It is pertinent to note that a majority of the Court did not
hold that the New York statute at issue in *Kingsley Int'l Pictures
Corp.* v. *Regents, supra,* was impermissibly vague.  The statute for-
bade the exhibition of a film "which portrays acts of sexual immoral-
ity' . . . or . . . presents such acts as desirable, acceptable or proper
patterns of behavior." *Id.,* at 685.  It appears that only the opinion
of Mr. Justice Clark, concurring in the result, upon which the Court
now relies so heavily, described this standard as vague.  Indeed, Mr.
Justice Frankfurter said in his separate opinion that the "Court
does not strike the law down because of vagueness . . . ." *Id.,* at

sentenced to five years' imprisonment forbade the mailing of material that was "obscene, lewd, lascivious, or filthy . . . or other publication of an indecent character." [15] 354 U. S., at 491. In *Alberts* v. *California,* the companion case to *Roth,* the California statute provided that the materials must have a "tendency to deprave or corrupt its readers." *Id.,* at 498. No definitions were included in either statute, yet the Court there explicitly rejected the argument that they did not "provide reasonably ascertainable standards of guilt . . . ." *Id.,* at 491. The Court recognized that the terms of obscenity statutes are necessarily imprecise, but emphasized, quoting *United States* v. *Petrillo,* 332 U. S. 1, 7–8, that the " 'Constitution does not require impossible standards'; all that is required is that the language 'conveys sufficiently definite warning as to the proscribed conduct when measured by common

---

695. See also *id.,* at 704. Mr. Justice Frankfurter went on to say that " '[s]exual immorality' is not a new phrase in this branch of law and its implications dominate the context. I hardly conceive it possible that the Court would strike down as unconstitutional the federal statute against mailing lewd, obscene and lascivious matter, which has been the law of the land for nearly a hundred years, see the Act of March 3, 1865, 13 Stat. 507, and March 3, 1873, 17 Stat. 599, whatever specific instances may be found not within its allowable prohibition. In sustaining this legislation this Court gave the words 'lewd, obscene and lascivious' concreteness by saying that they concern 'sexual immorality.' " *Id.,* at 695–696.

[15] The statute involved in *Roth* now provides in part that it is a criminal offense to import or transport in interstate commerce any "obscene, lewd, lascivious, or filthy book, pamphlet, picture, motion-picture film, paper, letter, writing, print, or other matter of indecent character . . . ." 18 U. S. C. § 1462. Similarly, § 1461 provides that it is a criminal offense to mail any "obscene, lewd, lascivious, indecent, filthy or vile" article. See also §§ 1463, 1464, 1465. Although each of these sections makes profuse use of the disjunctive, no definitions of any of these descriptive terms are provided.

understanding and practices. . . .' " [16] *Ibid.* Yet it should be repeated that the *Interstate Circuit* cases, unlike *Roth* and *Alberts,* involve merely the classification, not the proscription by criminal prosecution, of objectionable materials. In my opinion, the ordinance does not fail either to give adequate notice of the films that are to be restricted, or to provide sufficiently definite standards for its administration.[17]

Although the Court finds it unnecessary to pass judgment upon the materials involved in these cases, I consider it preferable to face that question. Upon the premises set forth in my *Roth* and *Memoirs* opinions, and reiterated here, I would hold that in condemning these materials New York and the City of Dallas have acted within constitutional limits.

I would affirm the judgments in all three cases.

---

[16] The Court went on to say that it "is argued that because juries may reach different conclusions as to the same material, the statutes must be held to be insufficiently precise to satisfy due process requirements. But, it is common experience that different juries may reach different results under any criminal statute. That is one of the consequences we accept under our jury system." 354 U. S., at 492, n. 30. Precisely similar reasoning should be applicable to boards like that created by the Dallas ordinance, although the cost of differences in result is here measured (at least initially) by film classifications, and not by lengthy terms of imprisonment.

[17] It is difficult to see how the Court could suppose that its *Memoirs* formula offers more precise warnings to film makers than does the Dallas ordinance. Surely the Court cannot now believe that "redeeming social value," "patent offensiveness," and "prurient interest" are, particularly as modified so as to apply to children, terms of common understanding and clarity. Moreover, one wonders whether the pandering rationale adopted in *Ginzburg* v. *United States, supra,* is thought to give more "guidance to those who seek to adjust their conduct" than does the Dallas ordinance. It is difficult to imagine any standard more vague, or more overbroad, than the "new subjectivity" created by the Court's search for the "leer of the sensualist." See Magrath, The Obscenity Cases: Grapes of Roth, 1966 Sup. Ct. Rev. 7, 61.