**TROPIC FILM CORPORATION,**
**Plaintiff,**
**v.**
**PARAMOUNT PICTURES CORPORATION, Paramount Film Distributing Corporation, and Motion Picture Association of America, Inc., Defendants.**
**No. 70 Civ. 926.**

United States District Court,
S. D. New York.
July 31, 1970.

Dickstein, Shapiro & Galligan, New York City, for plaintiff; David I. Shapiro, New York City, Judah Best, Washington, D.C., of counsel.

E. Compton Timberlake, Walter J. Josiah, Jr., New York City, for defendants Paramount Pictures Corp. and Paramount Film Distributing Corp.; Albert C. Bickford, Anthony L. Fletcher, New York City, of counsel.

Phillips, Nizer, Benjamin, Krim & Ballon, New York City, for defendant Motion Picture Assn. of America, Inc.; Louis Nizer, Neil A. Pollio, New York City, of counsel.

LASKER, District Judge.

In this suit challenging the legality of the Motion Picture Code and Rating Program ("Program") adopted in 1968 by major trade associations within the motion picture industry, the plaintiff moves for preliminary relief. The cast of characters consists of:

Joseph Strick ("Strick"), producer and director of a motion picture entitled "Tropic of Cancer." Strick maintains this suit pursuant to authorization on behalf of plaintiff Tropic Film Corporation.

Tropic Film Corporation ("Tropic"), a Swiss corporation owning a 50 percent interest in the motion picture "Tropic of Cancer."

Paramount Pictures Corporation (successor by merger of its former wholly owned subsidiary, Paramount Film Distributing Corporation) ("Paramount"), a producer and distributor of motion pictures. Paramount owns the remaining 50 percent of the film "Tropic of Cancer."

Motion Picture Association of America, Inc. ("MPAA"), a motion picture distributors trade association.

Tropic sues under Section 16 of the Clayton Act (15 U.S.C. § 26) for injunctive relief against all parties defendant and for treble damages under Section 4 of the Act (15 U.S.C. § 15) against MPAA. The present application is for a preliminary injunction restraining defendants from carrying on an asserted industry-wide refusal to deal in and distribute, advertise and exhibit plaintiff's film "Tropic of Cancer" without an "X" rating affixed to it and to its advertising. The complaint alleges that defendants and co-conspirators have conspired, in violation of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2), to refuse to exhibit, distribute or advertise the film without such a rating affixed.

In 1968 (under date of July 30 but signed November 19) Strick,[1] on behalf of "a company to be designated by him" (which in fact is Tropic Film Corporation), entered into an agreement with Paramount for the production and distribution of a motion picture based on Henry Miller's novel *Tropic of Cancer*. The picture was produced in accordance with the terms of the contract. Paramount financed the film, which cost approximately $1,750,000, $400,000 of which was paid to Strick[2] and is not recoverable by Paramount. In early 1970 the film, which was produced abroad, cleared United States Customs and was presented for rating to the committee established under the Program for that purpose. The committee rated the film X, and it has been distributed and advertised with an X rating affixed.

I.

Before outlining the contentions of the parties it is necessary to describe the procedure of the Program, which is the latest of a series of self-policing plans of the motion picture industry distinguishing films appropriate for adult viewing only from those appropriate for viewing by children. Although such programs or codes have existed since 1930, the current Program was initiated only in November 1968 and was largely influenced by the explosion of films containing explicitly sexual material both as to subject matter and photographic display.[3] A further impulse to estab-

---

1. The plaintiff here is Tropic Film Corporation. MPAA takes the position, with considerable support in the record, that Strick rather than the corporation is the real party in interest as plaintiff. The relevance of this contention is that there is substantial evidence that Strick, though he did not specifically approve submission of the film for rating, knowingly acquiesced in that procedure, and that it would be inequitable to enjoin the defendants from pursuing a course of action which he knowingly allowed to occur. In view of the disposition of the motion set forth in the text below, I find it unnecessary to determine whether Strick or Tropic is the true party in interest as plaintiff.

2. It appears from the record that the $400,000 was paid by Paramount through Tropic to Strick, but there is no dispute that Strick has received the money and that neither he nor Tropic is under obligation to repay any of it to Paramount. Neither Tropic nor Strick was obligated to or in fact did contribute to the costs of the production.

3. Although the question of whether "Tropic of Cancer" is obscene is not in any way at issue (and if it were, presumably its admission by United States Customs constitutes a government admission that it is not), there is no dispute that the film is sexually explicit to an extreme degree, not only in the numerous portrayals of nudity and sexual activity, but also in the pro-

lishment of the current Program emanated from the 1968 decisions of the United States Supreme Court in Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195, and Interstate Circuit v. Dallas, 390 U.S. 676, 88 S.Ct. 1298, 20 L.Ed.2d 225. *Ginsberg* held constitutional a New York statute which made it unlawful to sell to a minor a ticket to a motion picture which depicts "nudity, sexual conduct or sado-masochistic abuse and which is harmful to minors." *Dallas* found unconstitutionally vague an ordinance of the City of Dallas relating to the exhibition of "sexual promiscuity" or related matters to minors, but the decision taken together with *Ginsberg* was regarded by the industry as implying that a properly drawn ordinance might be found constitutional.

Desirous of continuing to exhibit films dealing frankly with sexual matters, and at the same time wishing to avoid what they felt might constitute an onslaught of legislative censorship, MPAA, together with the two other principal motion picture industry trade associations, International Film Importers and Distributors of America, Inc. ("IFIDA") and the National Association of Theatre Owners ("NATO"), announced the establishment of the Program on October 7, 1968. The affidavit of Jack Valenti (MPAA) and statements of Messrs. Podhorzer (IFIDA) and Rifkin (NATO) (attached to Valenti Affidavit) make it clear that the primary objective of the Program was "a concern for children." Indeed, there is no question that the Program rates films by any standard other than the suitability of viewing by children, or that it makes any attempt to rate the esthetic qualifications of a film. Under the present procedure, effective March 1, 1970 (not

substantially different from its predecessor) the ratings are as follows:

G: ALL AGES ADMITTED. General Audiences.

GP: ALL AGES ADMITTED. Parental Guidance Suggested.

R: RESTRICTED. Under 17 requires accompanying Parent or Adult Guardian.

X: NO ONE UNDER 17 ADMITTED. (Age limit may vary in certain areas.)

MPAA is composed of nine producing-distributing motion picture companies who produce or distribute a very substantial majority of the films shown in this country. The members of MPAA have agreed to submit their films for rating. A picture designated X does not carry the word "Approved" or the seal of MPAA, whereas pictures otherwise rated do. This distinction applies also to advertising of a rated film which the members of MPAA (including Paramount) have agreed to. Although MPAA members have agreed to abide by the provisions of the Program, no producer or distributor is required to submit a film for rating, and even as to MPAA members there is no sanction for failure to adhere to the agreement. (Valenti Affidavit, pp. 7–8).

In this connection it is significant that at least one major exhibitor in the metropolitan area of New York (The Walter Reade Organization, Inc.) which is a member both of MPAA and IFIDA has consistently refused to abide by the Program, and that a major foreign import, "I Am Curious—Yellow" has been distributed and exhibited in many parts of the country, although it was not submitted for rating under the Program nor did its producers voluntarily rate it.

Although NATO has not obligated itself or its members to enforce the Pro-

---

fuse use of ancient four-letter words of which in an earlier day Henry Miller was known as a daring pioneer. Nor does plaintiff appear to argue that the rating

X is inappropriate for the film; rather, it is contended that the rating system is illegal as violating the antitrust laws.

gram, it has "pledged to ask its members to cooperate with the Rating Program and to voluntarily adhere thereto," but does not sanction members who refuse to do so. (Valenti Affidavit, pp. 6–7).

The Program provides procedural safeguards, including the right of an applicant to appeal a rating to the Code and Rating Appeals Board, comprised of the President of MPAA, 12 persons who are directors of MPAA or executive officers of its members, eight exhibitors chosen by NATO, two by IFIDA, and two producers designated by Producers Guild of America. The Appeals Board has enacted regulations providing a detailed procedure permitting both written presentation and oral testimony. The rating of "Tropic of Cancer" was not appealed.

## II.

### Contentions of the Parties

Plaintiff argues that the agreement among MPAA and its members, supplemented by the cooperative agreement of NATO, constitutes a classic conspiracy in restraint of trade—in particular, a group boycott in violation of the antitrust laws. The boycott results, according to plaintiff, in severe economic loss to it because a significant percentage of theatres in the country will not show X-rated films, a large number of newspapers throughout the country will not advertise X-rated films, and television networks and airlines will not exhibit X-rated films to their viewers or passengers. Plaintiff contends that there are four issues raised by this motion:

1. Is there an agreement or combination?

2. If so, is that agreement or combination in violation of the antitrust laws?

3. If so, is plaintiff threatened with loss or damage thereby?

4. (In regard to this application for preliminary relief)—Is such threatened loss or damage so immediate and severe as to call for issuance of a preliminary injunction?

Defendants claim that the operation of the Program does not constitute either a restraint of trade or a group boycott; that any limitation on the exhibition of films by exhibitors, networks or airlines or the advertisement of the films by newspapers is entirely voluntary on the part of the exhibitors, networks, airlines and advertisers themselves; that, indeed, the same decisions would be reached by the same persons, whether or not an X rating was affixed to the film since the very content of any X-rated film—and in particular the "Tropic of Cancer"—makes it unsuitable for exhibition by networks [4] and airlines, and prompts the limitations self-imposed by exhibitors and advertisers; and that not only is there no showing on the present state of the record of any actual or threatened loss or damage (i. e., loss of revenue from exhibition of the picture under an X rating) to the plaintiff, but the evidence indicates that the film is making and will make receipts as large as or greater than it would have made on a non-rated basis.

As to the issues posed by plaintiff, defendants contend (1) that there is no agreement or combination; (2) that consequently it is not in violation of the antitrust laws; (3) that the plaintiff is not threatened with loss or damage; and (4) that consequently there is no

---

4. 18 U.S.C. § 1464 is entitled "Broadcasting obscene language" and reads:

"Whoever utters any obscene, indecent, or profane language by means of radio communication shall be fined not more $10,000 or imprisoned not more than two years, or both."

The FCC has taken note of Section 1464 in its administration of the licensing provisions of the Federal Communications Act. See, e. g., In Re WUHY–FM, Docket No. 46098, April 1, 1970. Even if the FCC had not focused attention on the statute, it is to be expected that the unqualified language of Section 1464 would put broadcasters on their mettle to watch the content of their material, whether rated or not.

threat of immediate or severe loss or damage.

## III.

### *The Merits of the Motion*

This motion was argued extensively by counsel of high standing, voluminously documented, and exhaustively briefed. After careful consideration of the agruments presented, and a detailed reading of the numerous affidavits and able briefs, I have concluded that, in the circumstances of this case, a preliminary injunction should not be granted.

■ As prerequisites to the granting of a preliminary injunction the court must find that the plaintiff will probably succeed on the merits of the case and that without injunctive relief he will be irreparably damaged. Studebaker Corp. v. Gittlin, 360 F.2d 692 (2d Cir. 1966); Symington Wayne Corp. v. Dresser Industries, Inc., 383 F.2d 840 (2d Cir. 1967). I find that plaintiff has not established that it will probably succeed on the merits of this case nor that it will be irreparably damaged by the failure to secure an injunction. Furthermore, I believe that the balance of hardships and the equities of the case compel the conclusion that preliminary relief is not warranted.

### A. *Probability of Success*

In determining that the plaintiff has not demonstrated the probability of its succeeding on the merits, I have in mind the many obstacles which plaintiff must overcome in order to prevail. These impediments fall into two classes: factual difficulties and legal difficulties.

#### 1. *Factual difficulties:*

The record is replete with sharp disputes between the parties as to the facts of the case and the disputes cannot be reconciled on the record as it stands. These differences include such central issues as the following:

*The effect of the X rating*: Tropic-Strick contend that the X rating is misleading viewers to believe that "Tropic of Cancer" is not a work of art and that the X mark has come to constitute a stigma. The defendants answer that this is not so, since, for example, the winner of the motion picture Academy award for the best picture of 1969, "Midnight Cowboy," carried an X rating, and is not only regarded as a success d'estime but also has proven to be an enormously profitable film. Defendants also emphasize Strick's admission on his deposition that he himself has known of X-rated pictures that have been very successful at the box office and of nonX-rated films that have done very poorly.

*Limitation of newspaper advertising:* Tropic-Strick argue that a very substantial number of American newspapers with extensive circulation refuse to accept advertising for an X-rated picture and that other newspapers will not permit "normal" advertising for such pictures. Strick's affidavit appears to establish that newspapers in cities with a total of several million in population and between one and two million in circulation engage in such practices. Defendants reply that only 25 of 1752 English language daily papers in the United States refuse to carry advertising for X pictures (Conte Affidavit, paras. 4 and 5); that these decisions are made by the publishers themselves; that the defendants not only are not responsible for such decisions, but have continually opposed them (Valenti Affidavit, para. 24); and that (as is undisputed) newspapers similarly refuse to advertise the well known but unrated film "I Am Curious—Yellow", so that it is reasonable to believe that if "Tropic of Cancer" were unrated it would nevertheless receive the same treatment.

*Refusals of exhibitors to show X-rated films:*

Tropic-Strick claim that 47 percent of the United States exhibitors refuse to show X-rated pictures. Defendants respond that the figure so quoted is derived from an outdated survey of no sta-

tistical validity,[5] and that the determination as to whether to exhibit films of sexual explicitness such as "Tropic of Cancer" is made individually by exhibitors who would (and in the past did) make the same determination, based on the content of a film, whether the film was rated or not.

*Television broadcasting:* Tropic-Strick argue strenuously that networks refuse, because of the X rating alone, to exhibit such films. Defendants contend (on the basis of affidavits from the manager of nighttime programs of the National Broadcasting Company, Inc., and the Vice President, Corporate Information, of National Broadcasting Company, Inc.) that the refusal to exhibit such films is based on the content and not the rating of the picture.

*In-flight film showings:* Tropic-Strick assert, again, that refusal of airlines to show X-rated pictures is caused solely by the rating of the pictures, and defendants reply, once more (on the basis of the affidavit of Max Fellerman, Vice President of Inflight Motion Pictures, Inc.) that the decision is made on content, not rating.

*Municipal prohibitions:* Tropic-Strick argue that a number of municipalities have enacted ordinances which prohibit the showing of "X pictures." Defendants answer that the assertion is false and that in any event such municipal action, if it occurs, is over the strenuous opposition of the motion picture industry. In this connection, rather serious doubt is cast on plaintiff's position by the affidavits of Barbara Scott, deputy attorney in charge of censorship matters of the motion picture industry, contradicting Strick's specific reference to an ordinance of the Town of Holyoke, Massachusetts, flatly denying that Holyoke has enacted any such ordinance, and asserting without qualification that X-rated pictures are indeed being shown there.

*The nature of the Program:* Strick alleges that the members of MPAA, IFIDA and NATO are required to abide by the Program. Defendants vigorously contend, and there is substantial evidence in the record to support the contention, that members of these organizations are not only free to reject the Program, but in fact have done so and continue to do so.

■ The sharpness and comprehensiveness of these factual disputes is significant, in view of the frequently pronounced rule that a preliminary injunction ought not to be granted where the record indicates that issues of fact exist which can only be resolved at trial. See, e. g., American Fabrics Co. v. Lace Art, Inc., 291 F.Supp. 589, 590 (S.D.N.Y. 1968); Vanguard Recording Society, Inc. v. Kweskin, 276 F.Supp. 563, 565 (S.D.N.Y.1967); Afran Transport Company v. National Maritime Union, 175 F.Supp. 285, 287 (S.D.N.Y.1959); and 601 West 26 Corp. v. Solitron Devices, Inc., 420 F.2d 293, 294 (2d Cir. 1969), in which the court observed:

> "The elaborate affidavits submitted by the parties illustrate that the factual issues are vigorously disputed and it is anything but clear that plaintiff will prevail on the merits. See Willheim v. Investors Diversified Services, Inc., 303 F.2d 276 (2d Cir. 1962)."

However, although this caveat of the courts is a significant factor in determining whether preliminary relief should be granted, I by no means base my determination of this motion on the caveat alone.

### 2. *Legal difficulties:*

This suit alleges a conspiracy in restraint of trade, specifically a group boycott, in violation of various provisions of the antitrust laws cited above. Does it appear probable that plaintiff will prevail at trial in establishing the

---

5. Affidavit of Richard M. Durwood, film buyer for the Durwood Corporation, Kansas City, Missouri, operating more than 30 theatres in nine states.

illegality of the "Program"? Without, of course, ruling on the merits of this complicated proposition, I find that on the present state of the record the plaintiff has not demonstrated such a probability.

Plaintiff places its principal reliance on such leading cases as Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), Radiant Burners, Inc. v. Peoples Gas Light & Coke Co., 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); Fashion Originators' Guild v. FTC, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941); Klor's, Inc. v. Broadway-Hale Stores, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). In my view, plaintiff's citation of these and other related cases is in the main inapposite. Plaintiff argues that *Silver* stands for the proposition that "whatever reason defendants urge to justify their action challenged here, whether it be purely commercial or based on a more elaborate social justification, defendants cannot escape the reach of the Sherman Act." (Plaintiff's Memorandum, pp. 10–11). In *Silver*, the New York Stock Exchange had, without giving reason for its action, ordered the discontinuance of direct-wire telephone connections between certain members of the New York Stock Exchange and nonmembers. The result was that one of the petitioners was forced out of business and the other's business was greatly diminished. The factual differences between *Silver* and the instant case are apparent. Here the defendants' "self-regulation" (i. e., the rating of "Tropic of Cancer") occurred pursuant to the contract between the parties to this suit and voluntary submission by the party having the right to distribute the film.[6] Clear and pre-announced standards were applied in the rating process, and an appeal system (not used here) was available permitting written presentation and oral argument. These distinctions are of importance in view of the Supreme Court's emphasis in *Silver*, 373 U.S. at 361, 83 S.Ct. at 1259:

> "The final question here is, therefore, whether the act of self-regulation in this case was so justified. The answer to that question is that it was not, *because the collective refusal to continue the private wires occurred under totally unjustifiable circumstances.*" (Emphasis added.)

And again,

> "[I]t is clear that no justification can be offered for self-regulation conducted *without provision for some method of telling a protesting nonmember why a rule is being invoked so as to harm him and allowing him to reply in explanation of his position.*" (Emphasis added.)

Putting aside these important distinctions, a reading of *Silver* shows that, far from determining that every group boycott automatically constitutes a *per se* violation, the Court held rather that "absent any justification derived from the policy of another statute *or otherwise,*"[7] a violation existed.

That *Silver* does not stand for the proposition that group boycotts are *per*

---

6. Paragraph 17 of the contract states:
   "Paramount will have right to determine manner of selling and advertising picture, but agrees to consult with Strick on general campaigns. Paramount also to have right to publicize before, during and after production, but will consult with Strick before issuance."
   Strick construes this to mean that "Paramount shall have control of advertising of the completed film." (Deposition of Strick, p. 84).

7. Notice the importance attached to the words "or otherwise" by commentators on *Silver*. See, e. g., Trade Association Exclusionary Practices, 66 Columbia L.Rev. 1486, at 1498; and Sherman Act Limited on Noncommercial Concerted Refusals to Deal, 1970 Duke L.J. 247 at 276. Both commentators italicize the words "or otherwise" and both articles establish with abundant clarity that, however strong the language of *Silver*, it does not stand for the proposition and the court has not ruled that group boycotts are *per se* violations of the Act.

*se* illegal is made clear in the opinion of the Court of Appeals of this Circuit in Cowen v. New York Stock Exchange (a post-*Silver* case),. 371 F.2d 661 (1967), in which the court remarked in reference to plaintiff's discharge by the Stock Exchange (at 664) that

> " * * * his discharge is * * * an instance 'of exchange self-regulation which fall[s] within the scope and purposes of the Securities Exchange Act [and] may be regarded as justified in answer to the assertion of an antitrust claim.' Silver v. New York Stock Exchange, supra, 373 U.S. at 361, 83 S.Ct. at 1259. Indeed, even absent a statutory duty of self-regulation such as that under the Securities Exchange Act, similar self-regulatory activities involving refusals to deal have been held not to violate the antitrust laws. See Deesen v. Professional Golfers Ass'n, 358 F.2d 165 (9th Cir.), cert. denied, 385 U.S. 846, 87 S. Ct. 72, 17 L.Ed.2d 76 (1966). See generally, [Note] Trade Association Exclusionary Practices: an Affirmative Role for the Rule of Reason, 66 Colum.L.Rev. 1486 (1966)."

See also Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F. 2d 71, 76–79 (9th Cir. 1969), cert. denied 396 U.S. 1062, 90 S.Ct. 752, 24 L. Ed.2d 755 (1970).

In *Radiant Burners, supra* (which held merely that a claim was stated and was not a decision on the merits), the complaint alleged that gas burners manufactured by plaintiff had been improperly refused approval by the defendants, who had formed an association for the testing and granting of seals of approval of such burners; that some of the defendants, gas sellers, had refused to sell gas for plaintiff's burners, while they sold gas for use in the approved burners manufactured by others, and that the plaintiff was therefore excluded from the market. Without regard to the difference between whether a claim has been stated on the one hand (as in *Radiant*) and, on the other, whether the probability exists that it will be proven at trial (as here), there are two important distinctions between *Radiant* and the present case—first, that the defendants in *Radiant* arbitrarily refused to grant approval to plaintiff's products and, second, that the action of the defendants was clearly and designedly anti-competitive, injuring the plaintiff and benefiting defendants. Here, it is clear that the affixation of the X rating was not arbitrarily imposed (indeed, plaintiff does not even make such a contention, and the defendants' actions are unrelated to competitive motives).

In *Fashion Originators' Guild, supra,* the Supreme Court held illegal a combination of manufacturers of women's garments which refused all sales to manufacturers and retailers who dealt in copies of their garments, or would not agree not to sell copies. The Court found that the purpose of the conspiracy and its potentiality was to create a monopoly, particularly in view of the coercion which it brought to bear on rival methods of competition. No such considerations exist in relation to the Program here in question, the purposes of which are not designed to eliminate competition but to advise motion picture exhibitors and, through them, the public, of the content of films which the Supreme Court has held that states have the constitutional right to prevent minors under 17 from viewing.

In *Klor's, Inc., supra,* a chain of department stores and numerous manufacturers and distributors admittedly conspired not to sell to petitioner (or to do so only at discriminatory prices). The Court in *Klor's* held merely, reversing lower decisions, that the undisputed group boycott was "not to be tolerated merely because the victim is just one merchant whose business is so small that his destruction makes little difference to the economy." 359 U.S. at 213, 79 S.Ct. at 710. The case here is entirely different. No admitted conspiracy exists, no sanction exists to penalize any member of the Program-subscribing organizations who does not abide by the Program, and the defendants may well es-

tablish at trial that the Program is justified and hence legal, in view of its purposes and effects.

I have not attempted, in this analysis of the decisions upon which plaintiff principally relies and of the differences between them and the instant case, to deal with the many other opinions cited by both plaintiff and defendants. However, a reading of those cases does not alter my view that plaintiff has not demonstrated a probability of success at trial.

## B. *Irreparable Damage*

■ Putting aside the question of whether plaintiff will probably succeed at trial, I find that failure to grant an injunction here will not irreparably damage plaintiff. Other than the permanent injunction which it seeks, the complaint demands only money damages, based on alleged loss of revenues assertedly flowing from the showing of "Tropic of Cancer" under an X rating. Even if one assumes, arguendo (and it is by no means demonstrated), that the plaintiff's claims of lost revenues are correct, no showing has been made that plaintiff's damages cannot be fully and promptly remedied by the granting of a money judgment against the defendants. Indeed, no attempt at such a showing has been made by the plaintiff, and it is reasonable to assume that its failure to do so is evidence of the financial strength of defendants and their ability to pay whatever damage judgment might be granted in this case. Whatever harm plaintiff may be shown to have suffered, then, is clearly reparable. That fact alone is sufficient ground for the denial of a preliminary injunction.

## C. *Equitable Considerations*

Even if the considerations expressed above were not controlling (as I believe they are), surely the equities of this case favor denial of preliminary relief. Tropic-Strick have already received, under the contract, $400,000 for the making of the film "Tropic of Cancer" which they are not obligated to repay. On the other hand, Paramount has received nothing and has expended $1,-075,000, as well as advertising and distribution costs (less receipts from rentals to date). While it is impossible to decide on a preliminary record (assuming it is possible to decide at all) whether the X rating will help or hurt profitability of the film, it seems equitable that where doubts exist they should be decided in favor of the party with the larger stake in the venture (to say nothing of the party with the larger experience in film distribution). In this connection it is to be remembered that Paramount is entitled not only to recover its costs from the film, but that after its costs are recovered Paramount continues to share the film revenues equally with Tropic-Strick. Furthermore, it is not disputed that the contract grants Paramount the sole "right to determine manner of selling and advertising picture," and where there is doubt as to whether plaintiff will prevail, it appears just to permit Paramount to exercise its uncontested contractual right without impediment.

■ Finally, it is to be noted that a clear public interest exists which will be affected by the court's action in this case. Such Supreme Court decisions as *Ginsberg* and *Dallas* have held this interest to be constitutionally significant. Except upon a strong showing, not here presented, that the plaintiff will probably succeed at trial, it would be improper for the court to restrain defendants from operating the Program, which at the very least gives the public some information about the content of the films offered for their viewing. As the Supreme Court stated in Yakus v. United States, 321 U.S. 414, 440–441, 64 S.Ct. 660, 675, 888 L.Ed. 834 (1944):

"* * * where an injunction is asked which will adversely affect a public interest for whose impairment, even temporarily, an injunction bond cannot compensate, the court may in the public interest withhold relief until a final determination of the rights

of the parties, though the postponement may be burdensome to the plaintiff. Virginian Ry. Co. v. United States, 272 U.S. 658, 672, 673, 47 S.Ct. 222, 228, 71 L.Ed. 463; (other citations omitted). This is but another application of the principle, declared in Virginian Ry. Co. v. System Federation, 300 U.S. 515, 552, 57 S.Ct. 592, 601, 81 L.Ed. 789, that 'Courts of equity may, and frequently do, go much further both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved."

Pursuant to Rule 52(a), this opinion constitutes the court's findings of fact and conclusions of law.

For the reasons stated above the motion for a preliminary injunction is denied.

It is so ordered.